## O'NEIL *v.* VERMONT.

ERROR TO THE SUPREME COURT OF THE STATE OF VERMONT.

No. 6. Argued January 20, 1892. — Decided April 4, 1892.

A complaint, in Vermont, before a justice of the peace, for selling intoxicating liquor without authority, was in the form prescribed by the state statute, which also provided, that, under such form of complaint every distinct act of selling might be proved, and that the court should impose a fine for each offence. After a conviction and sentence before the justice of the peace, the defendant appealed to the county court, where the case was tried before a jury. The defendant did not take the point, in either court, that there was any defect or want of fulness in the complaint. The jury found the defendant guilty of 307 offences, as of a second conviction for a like offence. He was fined $6140, being $20 for each offence, and the costs of prosecution, $497.96, and ordered to be committed until the sentence should be complied with, and it was adjudged, that if the fine and costs, and 76 cents, as costs of

commitment, aggregating $6638.72, should not be paid before a day named, he should be confined at hard labor, in the house of correction, for 19,914 days, being, under a statute of the State, three days for each dollar of the $6638. The facts of the case were contained in a written admission, and the defendant excepted because the court refused to hold that the facts did not constitute an offence. The case was heard by the Supreme Court of the State, (58 Vermont, 140,) which held that there was no error. On a writ of error from this court; *Held*,

(1) The term of imprisonment was authorized by the statute of Vermont;

(2) It was not assigned in this court, as error, in the assignment of errors or in the brief, that the defendant was subjected to cruel and unusual punishment, in violation of the Constitution of the United States;

(3) So far as that is a question arising under the constitution of Vermont, it is not within the province of this court;

(4) As a Federal question, the 8th Amendment to the Constitution of the United States does not apply to the States;

(5) No point on the commerce clause of the Constitution of the United States was taken in the county court, in regard to the present case, or considered by the Supreme Court of Vermont or called to its attention;

(6) The only question considered by the Supreme Court, in regard to the present case, was whether the defendant sold the liquor in Vermont or in New York, and it held that the completed sale was in Vermont; and that did not involve any Federal question;

(7) As the defendant did not take the point in the trial court that there was any defect or want of fulness in the complaint, he waived it; and it did not involve any Federal question;

(8) The Supreme Court of Vermont decided the case on a ground broad enough to maintain its judgment without considering any Federal question;

(9) The writ of error must be dismissed for want of jurisdiction in this court, because the record does not present a Federal question.

THIS case came on for argument in regular course on the 4th day of December in October term, 1889. The court ordered the case to be passed to be heard before a full bench. When reached at October term, 1890, it was again passed in consequence of the illness of counsel. The case as now made is stated in the opinion of the court.

*Mr. A. H. Garland* for plaintiff in error. *Mr. Charles. U. Joyce* and *Mr. Joel C. Baker* filed briefs for same.

*Mr. George F. Edmunds* for defendant in error. *Mr. P. Redfield Kendall* was on the brief for same.

Mr. Justice Blatchford delivered the opinion of the court.

On the 26th of December, 1882, a grand juror, of the town of Rutland, in the county of Rutland and State of Vermont, made a written complaint, on his oath of office, before a justice of the peace of that county, that John O'Neil, of Whitehall, New York, on December 25th, 1882, at Rutland, at divers times, did "sell, furnish and give away intoxicating liquor, without authority," and contrary to the statute, and further, that O'Neil, at the March term, 1879, of the Rutland County court, had been convicted of selling, furnishing and giving away intoxicating liquors, against the law. Thereupon the justice issued a warrant for the arrest of O'Neil. He was arrested and brought before the justice, and pleaded not guilty.

The statute of Vermont under which the prosecution was instituted is embodied in §§ 3800 and 3802 of chapter 169 of the Revised Laws of Vermont of 1880, (pp. 734, 735,) in these words:

"Section 3800. No person shall, except as otherwise especially provided, manufacture, sell, furnish or give away, by himself, clerk, servant or agent, spirituous or intoxicating liquor, or mixed liquor of which a part is spirituous or intoxicating, or malt liquors or lager beer; and the phrase 'intoxicating liquors' where it occurs in this chapter shall be held to include such liquors and beer.

"The word 'furnish,' where it occurs in this chapter, shall apply to cases where a person knowingly brings into or transports within the State for another person intoxicating liquor intended to be sold or disposed of contrary to law, or to be divided among or distributed to others.

"The words 'give away,' where they occur in this chapter, shall not apply to the giving of intoxicating liquor at private dwellings, or their dependencies, unless given to an habitual drunkard, or unless such dwelling or its dependencies become a place of public resort.

"But no person shall furnish or give away intoxicating liquor at an assemblage of persons gathered to erect a building or frame of a building, or to remove a building or at a public gathering for amusement.

"Nothing in this chapter shall prevent the manufacture, sale and use of wine for the commemoration of the Lord's supper, nor the manufacture, sale and use of cider, or, for medical purposes only, of wine made in the State from grapes or other fruits, the growth of the State, and which is without the admixture of alcohol or spirituous liquor, nor the manufacture by any one for his own use of fermented liquor.

"But no person shall sell or furnish cider or fermented liquor at or in a victualling house, tavern, grocery, shop, cellar or other place of public resort, or at any place to an habitual drunkard."

"Sec. 3802. If a person by himself, clerk, servant or agent, sells, furnishes or gives away; or owns, keeps or possesses with intent to sell, furnish or give away, intoxicating liquor or cider in violation of law, he shall forfeit for each offence to the State, upon the first conviction ten dollars and costs of prosecution; on the second conviction he shall forfeit for each offence twenty dollars and costs of prosecution, and shall also be imprisoned one month; and on the third and subsequent convictions he shall forfeit for each offence twenty dollars and the costs of prosecution, and shall also be imprisoned not less than three months nor more than six months."

The complaint was in the form prescribed by § 3859 of the Revised Laws of Vermont, for offences against § 3802; and § 3860 provides that under such form of complaint "every distinct act of selling" may be proved, "and the court shall impose a fine for each offence."

The justice, after hearing the proofs of the parties, entered judgment finding O'Neil guilty of 457 offences, second conviction, of selling intoxicating liquors in violation of chapter 169 of the Revised Laws, and adjudging that he pay to the treasurer of the State a fine of $9140, and the costs of prosecution, taxed at $472.96, and be confined at hard labor in the house of correction at Rutland for the term of one month,

and that, in case such fine and costs should not be paid on or before the expiration of said term of one month's imprisonment, he should be confined at hard labor in the house of correction at Rutland for the further term of 28,836 days, to be computed from the expiration of said term of one month's imprisonment. From that judgment O'Neil appealed to the county court of Rutland County. The appeal was allowed, and he gave bail for his appearance.

In the county court O'Neil pleaded not guilty, and the case was tried by a jury. He did not take the point, either before the justice of the peace or the county court, that there was any defect or want of fulness in the complaint. Any such point was waived, by the failure to take it. Besides, it did not involve any Federal question. The question of the consolidation of several offences in one complaint is purely a matter of state practice, and it is a familiar rule of criminal law, that time need not be proved as alleged.

The jury found O'Neil guilty of 307 offences " of selling intoxicating liquor without authority and contrary to the laws of Vermont, as of a second conviction for a like offence." He filed exceptions, which state that, for the purpose of the trial, he admitted the following facts: "The respondent, John O'Neil, of Whitehall, in the county of Washington and State of New York, is a wholesale and retail dealer in wines and liquors at said Whitehall, and has been so engaged in business there for more than three years last past, and that said business by him carried on is a lawful and legitimate business under the laws of the State of New York as conducted by him there. That during the last three years the respondent has received at his store, in said Whitehall, three hundred and seven separate and distinct orders by mail, telegraph and express, for specified and designated small quantities of intoxicating liquors, from as many different parties residing in Rutland, in the State of Vermont. The orders so sent by express were in the form of a letter addressed to the said John O'Neil at Whitehall aforesaid, and the letter attached to a jug, and the jug, with the letter attached, was delivered by said parties to the National Express Company, in Rutland, and charges

thereon paid by the parties so sending the order. Orders sent by mail were by letters or postal cards deposited in the post-offices at said Rutland, directed to John O'Neil at Whitehall, New York, and postage paid thereon. Orders sent by tele-graph were delivered by the sender at the telegraph offices in said Rutland, directed to said John O'Neil, Whitehall, New York, and charges paid by the sender, which orders requested the respondent to send said intoxicating liquors to the parties ordering the same at said Rutland, and in more than one-half the number of instances said orders directed him to send said liquors by express, C. O. D., and in the other instances, where the orders did not specify, it was the intention of the pur-chaser to have the goods so sent to him. It is the usual course of trade for merchants receiving an order from a consider-able distance for goods in small quantities, to send the same by express, C. O. D., when the order is not from a regular customer or a party of known responsibility. That upo t the receipt of said orders the respondent has in each case meas-ured out the liquors called for in his order at his store in Whitehall aforesaid, and packed the same in jugs or other vessels, and attached to each package a tag, upon which was written the name and address of the party orderi g the same, and delivered each package so directed and addressed, at Whitehall, aforesaid, to the National Express Company, a New York corporation, a common carrier, doing business between New York and Montreal and including the route between said Whitehall and said Rutland, and each of said packages also had upon said tag the name and business card of the respondent, and none of said packages were in any manner disguised, and all of them were sealed with wax. It was not stated on the jugs or tags what they contained. The respondent at the same time delivered to said express com-pany a bill of said liquor, which said carrier placed in an envelope, marked C. O. D., which envelope had endorsed thereon, among other things, the following instructions: 'Do not deliver the whole or any part of the goods accompanying this bill until you receive pay therefor. Be careful to notice what money you receive, and, as far as practicable, send the

same as received and follow the special instructions of the shipper, if any are given, on the bills. If goods are refused or the parties cannot be found, notify the office from whence received, with names and dates, and await further instructions' — meaning thereby that said express company should receive the amount of said bill upon the delivery of the package to the consignee, and that without payment of said bill the said liquor should not be delivered; that, in the usual and ordinary course of business of said carrier in such cases, the said express company delivered each of said packages to the consignee named upon said tag, at Rutland, and at the same time and concurrently with such delivery received the amount of the said bill in the C. O. D. envelope, the amount of freight for the transportation of said package from Whitehall to Rutland, and the charges for returning said money to the respondent at Whitehall. The express company placed said money for the payment of said bill in the same envelope and returned it to the respondent at Whitehall. The respondent did nothing to or with said liquors after the said packages were delivered by him at said Whitehall to said common carrier, and the said several consignées received the same and made payment as aforesaid, at Rutland, as and under the contract made, as aforesaid, through their said orders so sent to the respondent at Whitehall. That it is the usual and ordinary course of business of said express company, in case goods are refused or the consignees cannot be found, for the office to which goods are sent to notify the office from which they were shipped to notify the consignor of the facts, and the consignor would be consulted and his orders taken and followed as to the disposition of the goods, and this would be the same whether goods were sent C. O. D. or otherwise. The respondent gave no special directions as to any of the packages shipped as aforesaid." It appears clearly, from this admission of facts, that the charges paid in Rutland, to the express company, when the empty jug was sent from Rutland, included only the charges for the transportation of the empty jug to Whitehall, and that the amount of freight for the transportation of the packages containing liquor, from Whitehall to Rutland, was

paid when it was delivered to its consignee at Rutland, simultaneously with the payment of the bill for the liquor, and of the charges for returning the money to Whitehall.

The exceptions state that O'Neil requested the court to instruct the jury that the facts set forth in his admission did not constitute an offence against the statute, under the complaint in the cause, but the court refused so to hold, and he excepted; that he requested the court also to instruct the jury that, under the facts set forth in his admission, they ought to find him not guilty, but the court refused so to instruct the jury, and he excepted; that the court charged the jury, that if they believed the facts set forth in the admission to be true, the same made a case upon which the jury should find a verdict of guilty against him, to which instruction he excepted; that evidence was given that at the March term, 1879, of the Rutland County court, he was convicted of selling, furnishing and giving away intoxicating liquors; and that the court adjudged, upon the verdict and the evidence, that he was guilty of 307 offences of selling intoxicating liquor without authority, as of a second conviction. The exceptions were allowed, and for their trial the sentence was respited, execution stayed and the cause passed to the Supreme Court of Vermont.

. The judgment of the county court, as entered, was, that O'Neil pay a fine of $6140, and the costs of prosecution, taxed at $497.96, and stand committed until the sentence should be complied with; and that if the said fine and costs, and costs of commitment, ascertained to be 76 cents, the whole aggregating $6638.72, should not be paid before March 20, 1883, he should be confined at hard labor, in the house of correction at Rutland, for the term of 19,914 days.

The case was heard in the Supreme Court, and a decision was rendered in the general term, the Chief Judge and six Assistant Judges being present, at October term, 1885, which is reported in 58 Vermont, 140. The judgment of the Supreme Court was, that the judgment of the county court was not in anywise erroneous or defective and there was not any error in the proceedings. O'Neil has sued out a writ of error from this court to review that judgment.

The trial and conviction of O'Neil in the county court were solely for "selling intoxicating liquor without authority." The punishment prescribed therefor by § 3802 was that "on the second conviction, he shall forfeit for each offence twenty dollars and costs of prosecution, and shall also be imprisoned one month." The term of confinement for 19,914 days was three days for each dollar of the $6638, under § 4366 of the Revised Laws of Vermont, which prescribes that time of imprisonment in default of payment of the fine and costs in criminal cases. It is not assigned in this court, as error, in the assignment of errors, or in the brief for O'Neil, that he was subjected to cruel and unusual punishment, in violation of the Constitution of the United States. It appears by the report of the case in 58 Vermont, that he took the point in the Supreme Court of Vermont, that the statute of that State was repugnant to the 8th Amendment to the Constitution of the United States and to that of Vermont, in that it allowed "cruel and unusual punishment." That court said, in its opinion: "The constitutional inhibition of cruel and unusual punishments, or excessive fines or bail, has no application. The punishment imposed by statute for the offence with which the respondent, O'Neil, is charged, cannot be said to be excessive or oppressive. If he has subjected himself to a severe penalty, it is simply because he has committed *a great many* such offences. It would scarcely be competent for a person to assail the constitutionality of the statute prescribing a punishment for burglary, on the ground that he had committed so many burglaries that, if punishment for each were inflicted on him, he might be kept in prison for life. The mere fact that cumulative punishments may be imposed for distinct offences in the same prosecution is not material upon this question. If the penalty were unreasonably severe for a *single* offence, the constitutional question might be urged; but here the unreasonableness is only in the number of offences which the respondent has committed." We forbear the consideration of this question, because as a Federal question, it is not assigned as error, nor even suggested in the brief of the plaintiff in error; and, so far as it is a question arising under the constitution of Ver-

mont, it is not within our province. Moreover, as a Federal question, it has always been ruled that the 8th Amendment to the Constitution of the United States does not apply to the States. *Pervear* v. *The Commonwealth*, 5 Wall. 475.

The opinion of the Supreme Court of Vermont was delivered by Chief Judge Royce. The case being one for selling intoxicating liquors contrary to law, the court stated the question to be, whether the liquors were sold by O'Neil, in contemplation of law, in Rutland County, and said that the answer depended upon whether the National Express Company, by which the liquors were delivered to the consignees thereof, was in law the agent of the vendor or of the vendees; that, if the purchase and sale of the liquors was fully completed in the State of New York, so that, upon delivery of them to the express company for transportation, the title vested in the consignees, as in the case of a completed and unconditional sale, then no offence against the law of Vermont had been committed; but that if, on the other hand, the sale, by its terms, could become complete, so as to pass the title in the liquors to the consignees, only upon the doing of some act, or the fulfilling of some condition precedent, after they reached Rutland, then the rulings of the county court upon the question of the offence were correct.

The court then said: "The liquors were ordered by residents of Vermont from dealers doing business in the State of New York, who selected from their stock such quantities and kinds of goods as they thought proper in compliance with the terms of the orders, put them up in packages, directed them to the consignees, and delivered them to the express company as a common carrier of goods for transportation, accompanied with a bill, or invoice, for collection. The shipment was in each instance which it is necessary here to consider, 'C. O. D.;' and the cases show that the effect of the transaction was a direction by the shipper to the express company not to deliver the goods to the consignees except upon payment of the amount specified in the C. O. D. bills, together with the charges for the transportation of the packages and for the return of the money paid. This direction was understood by

the express company, which received the shipments coupled therewith."

The court then remarked, that whether or not, and when, the legal title in property sold passes from the vendor to the vendee, is always a question of the *intention* of the parties, which is to be gathered from their acts and all the facts and circumstances of the case taken together, and cited *Mason* v. *Thompson,* 18 Pick. 305 ; Benjamin on Sales, §§ 311, 319, note c, and 320, note d ; and Robert's Vermont Digest, 610, *et seq.* It then proceeded : "In the cases under consideration," (viz. : the present case, and another case against O'Neil, for keeping intoxicating liquors with the intent to sell, etc.,) "the vendors of the liquors shipped them in accordance with the terms of the orders received, and the mode of shipment was as above stated. They delivered the packages of liquors, properly addressed to the several persons ordering the same, to the express company, to be transported by that company and delivered by it to the consignees upon fulfilment by them of a specified condition precedent, namely, payment of the purchase price and transportation charges and not otherwise. Attached to the very body of the contract, and to the act of delivery to the carrier, was the condition of payment before delivery of possession to the consignee. With this condition unfulfilled and not waived, it would be impossible to say that a delivery to the carrier was *intended* by the consignor as a delivery to the consignee, or as a surrender of the legal title. The goods were intrusted to the carrier to transport to the place of destination named, there to present them for acceptance to the consignee, and *if* he accepted them and paid the accompanying invoice and the transportation charges, to deliver them to him ; otherwise, to notify the consignor and hold them subject to his order. It is difficult to see how a seller could more positively and unequivocally express his intention *not* to relinquish his right of property or possession in goods until payment of the purchase price than by this method of shipment. We do not think the case is distinguishable in principle from that of a vendor who sends his clerk or agent to deliver the goods, or forwards them to, or makes them

deliverable upon the order of, his agent, with instructions not
to deliver them except on payment of the price, or perform-
ance of some other specified condition precedent by the ven-
dee.    The vendors made the express company their agent in
the matter of the delivery of the goods, with instructions not
to part with the possession of them except upon prior or con-
temporaneous receipt of the price.    The contract of sale, there-
fore, remained inchoate or executory while the goods were in
transit, or in the hands of the express company, and could
only become executed and complete by their delivery to the
consignee.    There was a completed executory *contract* of sale
in New York; but the completed *sale* was, or was to be, in
this State."

The foregoing comprises all that was said by the Supreme
Court material to the case now before us.

It is assigned for error, that the Supreme Court held (1)
that the sale of intoxicating liquor in New York, by a citizen
of that State lawfully, was a crime under the statute law of
Vermont, when the liquor so sold was shipped C. O. D. to the
purchaser in Vermont, by his direction; (2) that a shipment
of liquors by a common carrier from New York, by a citizen
of that State to a purchaser in Vermont, under the circum-
stances of this case, was a crime under the statute of Vermont,
which could be punished by the courts of Vermont; (3) that
such statute was not in conflict with the clause of the Consti-
tution of the United States which gives Congress power to
regulate commerce with foreign nations and among the sev-
eral States and with the Indian tribes; (4) that O'Neil, under
the facts in this case, was amenable to the statute law of Ver-
mont prohibiting the sale, furnishing and giving away of in-
toxicating liquors; and (5) that the construction the court
gave to that statute, and its application to the facts of this
case, was not in conflict with § 8 of article 1 of the Constitu-
tion of the United States, in regard to the regulation of
commerce.

It is contended for the State of Vermont that this court has
no jurisdiction of this case, because the record does not pre-
sent a Federal question.    We are of opinion that this conten-

tion is correct, and that the writ of error must be dismissed for want of jurisdiction in this court.

No point on the commerce clause of the Constitution of the United States was taken in the county court, in regard to the present case, or considered by the Supreme Court of Vermont. One reason for this may have been that the decision in *Peirce* v. *New Hampshire*, 5 How. 504, had not theretofore been in terms overruled or questioned by this court, the cases of *Bowman* v. *Chicago &c. Railway Co.*, 125 U. S. 465, and *Leisy* v. *Hardin*, 135 U. S. 100, not having been then decided. The only points raised in the county court, according to the exceptions, were, that the facts set forth in the written admission of O'Neil did not constitute an offence against the statute of Vermont under the complaint, and that he ought to be found not guilty under the facts so set forth. The matters thus excepted to were too general to call the attention of the state court to the commerce clause of the Constitution, or to any right claimed under it. *Farney* v. *Towle*, 1 Black, 350; *Day* v. *Gallup*, 2 Wall. 97; *Edwards* v. *Elliott*, 21 Wall. 532; *Warfield* v. *Chaffe*, 91 U. S. 690; *Susquehanna Boom Co.* v. *West Branch Boom Co.*, 110 U. S. 57; *Clark* v. *Pennsylvania*, 128 U. S. 395.

The only question considered by the Supreme Court, in its opinion, in regard to the present case, was whether the liquor in question was sold by O'Neil at Rutland or at Whitehall, so as to fall within or without the statute of Vermont, and the court arrived at the conclusion that the completed sale was in Vermont. That does not involve any Federal question.

In its opinion in 58 Vermont, 140, the Supreme Court considered not only the present case and the case before referred to against O'Neil for keeping intoxicating liquors with intent to sell, etc., but also two other cases, being proceedings *in rem* for the condemnation of intoxicating liquor on its seizure, in which latter two cases the National Express Company was claimant, and in one of them the liquors were forfeited, while in the other of them some of the liquors, (being those which had been paid for to the shipper at Whitehall, New York,) were returned to the claimant and the remainder forfeited.

In its opinion, the court said: "Concerning the claim that section 8" of article 1, "of the Federal Constitution, conferring upon Congress the exclusive right to regulate commerce among the States, has application, it is sufficient to say that no regulation of or interference with interstate commerce is attempted." That this observation had reference solely to the two seizure cases, and not to the present case, is apparent from the fact that the court immediately went on to say: "If an express company or any other carrier or person, natural or corporate, has in possession within this State an article in itself dangerous to the community, or an article intended for unlawful or criminal use within the State, it is a necessary incident of the police powers of the State that such article should be subject to seizure for the protection of the community." The liquors in those two cases *in rem* were seized by the sheriff at Rutland, while in the possession of the National Express Company, some of them having been delivered to that company at Troy, New York, and some at Whitehall, New York, and all of them having been ordered by persons at Rutland for their own use and not for sale or distribution contrary to law.

The Supreme Court of Vermont decided the case before us upon a ground broad enough to maintain its judgment without considering any Federal question. No Federal question was presented for its decision, as to this case, nor was the decision of a Federal question necessary to the determination of this case, nor was any actually decided, nor does it appear that the judgment as rendered could not have been given without deciding one. *Hale* v. *Akers*, 132 U. S. 554, 565, and cases there cited; *San Francisco* v. *Itsell*, 133 U. S. 65; *Hopkins* v. *McLure*, 133 U. S. 380; *Blount* v. *Walker*, 134 U. S. 607; *Beatty* v. *Benton*, 135 U. S. 244; *Johnson* v. *Risk*, 137 U. S. 300; *Butler* v. *Gage*, 138 U. S. 52; *Beaupré* v. *Noyes*, 138 U. S. 397; *Leeper* v. *Texas*, 139 U. S. 462; *Henderson Bridge Co.* v. *Henderson City*, 141 U. S. 679; *Hammond* v. *Johnston*, 142 U. S. 73; *New Orleans* v. *New Orleans Water Works Co.*, 142 U. S. 79.

It was entirely immaterial how the liquor sold by O'Neil at

Rutland came to be there, for sale there — whether it was made there, or whether it was brought in some way from the State of New York. The only question was whether it was at Rutland so as to be capable of sale there, and whether it was sold there.

Moreover, under the practice in the Supreme Court of Vermont, the very error relied upon must appear affirmatively in the exceptions. *Sequin* v. *Peterson*, 45 Vermont, 255; *State* v. *Preston*, 48 Vermont, 12; *Hathaway* v. *National Life Ins. Co.*, 48 Vermont, 335; *State* v. *Brunelle*, 57 Vermont, 580; *Spaulding* v. *Warner*, 57 Vermont, 654; *Rowell* v. *Fuller*, 59 Vermont, 688.

The result is that the writ of error must be

*Dismissed.*

Mr. Justice Field dissenting.

I am compelled to disagree with my associates in their disposition of this case. The act charged as an offence in the State of Vermont was in my judgment a lawful transaction in the State of New York. It will, I think, strike many men with surprise to learn that filling an order for the purchase of goods and their transmission from one State by an express carrier, to be paid for on delivery to the buyer in another State can be turned into a criminal offence of the person filling the order in the State where he was not present.

The offence charged consisted of selling, furnishing and giving away intoxicating liquor in Vermont, without authority of law, yet the accusation presenting it makes no mention of any person to whom the article was sold, furnished or given. Here is a copy of the document:

" State of Vermont, } ss:
Rutland County, }

" To Wayne Bailey, Esq., justice of the peace within and for the county of Rutland, comes J. P. Cain, grand juror, of the town of Rutland, in said county of Rutland, and on his oath of office complaint makes that John O'Neil, of White-

hall, N.Y., to wit, on the 25th day of December, A.D. 1882, at Rutland aforesaid, did at divers times sell, furnish and give away intoxicating liquor without authority, contrary to the form, force and effect of the statute in such case made and provided and against the peace and dignity of the State.

"J. P. CAIN, Grand Juror."

The accusation describes only a single offence; yet, by the addition of the words "at divers times," that document is held to justify a trial and uphold a conviction for three hundred and seven distinct offences, only one of which is set forth in the accusation, and that defectively, all the others being brought within it by the use of those words.

The punishment imposed was one exceeding in severity, considering the offences of which the defendant was convicted, anything which I have been able to find in the records of our courts for the present century. By the justice of the peace in Vermont, before whom the defendant was accused, he was convicted of four hundred and fifty-seven distinct offences, and sentenced to pay to the treasurer of the State a fine of $9140 and the costs of prosecution taxed at $472.96, and be confined at hard labor in the house of correction in the county of Rutland for one month, and, in case the fine and costs should not be paid on or before the expiration of this month's imprisonment, to be confined there at hard labor for the further term of twenty-eight thousand eight hundred and thirty-six days, to be computed from the expiration of the month's imprisonment. This was more than seventy-nine years for selling, furnishing and giving away, as alleged, intoxicating liquor, which took place in New York, to be delivered in Vermont. An appeal having been taken from that judgment to the county court of Rutland County, a jury was called and the accused pleaded not guilty, and although but one charge was specified, and that defectively, in the complaint, which was the one filed before the justice of the peace, the jurors found him guilty of three hundred and seven distinct offences of selling intoxicating liquors without authority and contrary to the laws of Vermont. He was thereupon sen-

tenced to pay a fine of $6140 to the treasurer of the State, and the costs of prosecution taxed at $497.96, and stand committed until the sentence was complied with ; and in case the fine and costs were not paid before the 20th day of March, 1883, at three o'clock in the afternoon of that day, to be confined at hard labor in the house of correction, for the term of nineteen thousand nine hundred and fourteen days, a period of over fifty-four years, a reduction from the term imposed by the justice of the peace of about twenty-five years.

Had he been found guilty of burglary or highway robbery, he would have received less punishment than for the offences of which he was convicted. It was six times as great as any court in Vermont could have imposed for manslaughter, forgery or perjury. It was one which, in its severity, considering the offences of which he was convicted, may justly be termed both unusual and cruel.

That designation, it is true, is usually applied to punishments which inflict torture, such as the rack, the thumbscrew, the iron boot, the stretching of limbs and the like, which are attended with acute pain and suffering. Such punishments were at one time inflicted in England, but they were rendered impossible by the Declaration of Rights, adopted by Parliament on the successful termination of the revolution of 1688, and subsequently confirmed in the Bill of Rights. It was there declared that excessive bail ought not to be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted. From that period this doctrine has been the established law of England, intended as a perpetual security against the oppression of the subject from any of those causes. It is embodied in the Eighth Amendment to the Constitution of the United States, and in the constitutions of several of the States, though Mr. Justice Story states in his Commentaries on the Constitution " that the provision would seem to be wholly unnecessary in a free government, since it is scarcely possible that any department of such a government should authorize or justify such atrocious conduct." (§ 1903.) The inhibition is directed, not only against punishments of the character mentioned, but against all punish-

ments which by their excessive length or severity are greatly disproportioned to the offences charged. The whole inhibition is against that which is excessive either in the bail required, or fine imposed, or punishment inflicted. Fifty-four years' confinement at hard labor, away from one's home and relatives, and thereby prevented from giving assistance to them or receiving comfort from them, is a punishment at the severity of which, considering the offences, it is hard to believe that any man of right feeling and heart can refrain from shuddering. It is no matter that by cumulative offences, for each of which imprisonment may be lawfully imposed for a short time, the period prescribed by the sentence was reached, the punishment was greatly beyond anything required by any humane law for the offences. The State may, indeed, make the drinking of one drop of liquor an offence to be punished by imprisonment, but it would be an unheard-of cruelty if it should count the drops in a single glass and make thereby a thousand offences, and thus extend the punishment for drinking the single glass of liquor to an imprisonment of almost indefinite duration. The State has the power to inflict personal chastisement, by directing whipping for petty offences — repulsive as such mode of punishment is — and should it, for each offence, inflict twenty stripes it might not be considered, as applied to a single offence, a severe punishment, but yet, if there had been three hundred and seven offences committed, the number of which the defendant was convicted in this case, and six thousand one hundred and forty stripes were to be inflicted for these accumulated offences, the judgment of mankind would be that the punishment was not only an unusual but a cruel one, and a cry of horror would rise from every civilized and Christian community of the country against it. It does not alter its character as cruel and unusual, that for each distinct offence there is a small punishment, if, when they are brought together and one punishment for the whole is inflicted, it becomes one of excessive severity. And the cruelty of it, in this case, by the imprisonment at hard labor, is further increased by the offences being thus made infamous crimes. In *Ex parte Wilson*, 114 U. S.

417, 429, a party under sentence of imprisonment for fifteen years at hard labor in the house of correction, in Detroit, Michigan, was discharged by this court because he was not tried upon an indictment or presentment of a grand jury, the court holding that a crime, punishable by imprisonment for a term of years at hard labor, was an infamous crime within the meaning of the Fifth Amendment of the Constitution of the United States. The selling of the liquors in New York during three years, upon three hundred and seven distinct orders from Vermont, that is, one in every three or four days, to be paid for on delivery in the latter State, are declared by the punishment inflicted three hundred and seven infamous crimes.

I have stated these particulars of the proceedings and of the judgment of the state courts, to show what great wrongs were inflicted, under the forms of law, upon the defendant. If there is no remedy for them, there is a defect in our laws or in their administration which cannot be too soon corrected. I think there is a remedy, and that it should be afforded by this court.

The sales for which the defendant was prosecuted were either completed transactions in New York, passing there the title to the goods, leaving their transportation to the purchaser in Vermont as a matter for his direction; or, they were mere executory contracts of sale in New York to be completed by delivery of the goods to the purchaser in Vermont.

If the first position be the true one, then Vermont, in attempting to punish the defendant, assumed to punish him for an exterritorial offence by her statute, or to apply her statute to an offence not embraced by its terms. If the former of these alternatives be the one she takes, that is, to punish the defendant for an exterritorial offence, she violates the right of a citizen of New York, and a right of that citizen, which depends upon the relation of his State to the Union, and, as that relation forbids a resort to arms, or negotiation, or any international procedure for protection of her citizens, it belongs to that class of rights which pertain to a citizen of the United States. His rights as such citizen are guarded and must be

defended by the United States, and cannot be abridged or impaired by the law of any State.

. But if the statute of Vermont does not reach the defendant by exterritorial operation, and the sales were only inchoate in New York, and consummated by delivery in Vermont, then the acts of selling were exterritorial, and the delivery was by interstate transportation. Until that transportation was completed and the packages of goods were delivered to the purchasers, they were under the commercial power of Congress and not the police power of the State, and the intrusion of the latter to defeat the full protection of the Congressional power was necessarily void.

I assume for this case, as correct, the position of the majority of this court and of the Supreme Court of Vermont, that the sales were only initiated in New York, and were there merely executory contracts, and were not consummated until delivery of the goods to the purchaser in Vermont. As such they were transactions of interstate commerce which the latter State could not prevent, and for which she could not impose any penalty upon the defendant, though she might place such restrictions upon the disposition of the liquor, as the safety and health of the community might require, after it was brought within her limits, and had become part of the general property there. Against the proceedings resulting in the penalty inflicted, the defendant invoked — and in my judgment was entitled to receive — protection under the clause of the Constitution of the United States vesting in Congress the exclusive power to regulate commerce among the States. The refusal of the state court to afford the protection is sufficient ground for this court to take jurisdiction to review the judgment of that court, and I dissent from my associates in their declining to take such jurisdiction.

On the trial before the county court certain facts were admitted by the accused which constitute the grounds of his conviction. They are given in the opinion of the majority, and it is only necessary to state so much of them as will show the pertinency of the objections I take. The accused resided at Whitehall, in the State of New York, a flourishing town of

several thousand inhabitants, and considerable commerce, at the south end of Lake Champlain, and about twenty-four miles west of Vermont.

He was a wholesale and retail dealer in wines and liquors at that place, and had been there engaged in that business for more than three years. His business was a lawful one under the laws of New York. During those three years he received at his store in Whitehall three hundred and seven separate and distinct orders by mail, telegraph or express for specified small quantities of intoxicating liquors from as many different parties residing in Rutland, Vermont. The orders requested the accused to send the liquors to the parties ordering them at Rutland by the National Express Company, a New York corporation and common carrier, doing business between New York and Montreal, including the route between Whitehall and Rutland, and in more than one-half the number of instances directed that the liquors be sent C. O. D., meaning cash on delivery, and in other instances where the orders did not specify this mode it was the intention of the purchaser to have the goods thus sent to him.

It was the usual course of trade for merchants receiving an order from a considerable distance for goods in small quantities to send the same by express, C. O. D., when the order was not from a regular customer or a person of known responsibility. Upon the receipt of the orders the accused in each instance measured out the liquors called for at his store in Whitehall, put the same in the jugs or other vessels sent, and attached to each one a tag having the address of the party ordering the liquor. He then delivered the package to the express company, each package having upon the tag the name and business of the accused, and not being in any manner disguised, and being sealed with wax. He delivered to the express company with each package a bill in an envelope marked C. O. D., endorsed with instructions not to deliver the same without receiving payment therefor.

He did nothing after the packages were delivered by him at Whitehall; and the several consignees received the same and made payment therefor to the carrier at Rutland.

The accused requested the court to instruct the jury that the facts set forth in his admission did not constitute an offence against the statute, under the complaint in the case, but the court refused the request, and he excepted. He also requested the court to instruct the jury that under the facts they ought to find him not guilty, but this the court refused to do, and he excepted. The court charged the jury that if they believed the facts set forth in the admission they made a case upon which the jury should find a verdict of guilty against him, to which instruction he excepted.

The case was carried to the Supreme Court of the State, and by it the judgment below was affirmed. In giving its opinion that court stated that the case being one for selling intoxicating liquors the question was whether they were sold by the accused in contemplation of law in Rutland County, and that the answer depended upon the question whether the National Express Company, by which the liquors were delivered to the consignees thereof, was in law the agent of the vendor or of the vendees. It stated that the effect of the transaction was a direction by the shipper to the express company not to deliver the goods to the consignees except upon payment of the amount specified in the C. O. D. bills, together with the *charges for the transportation of the packages and for the return of the money paid;* and that this direction was so understood by the express company, which received the shipments coupled therewith. This statement ignores the fact in the admission of the accused, which was submitted to the jury, that the express company was the agent of the Rutland parties, the expenses of that company being paid by the senders of the orders, a fact which showed that the company acted for the purchasers and not for the vendor in the several cases in the carriage to Vermont of the articles sold.

The several transactions appear to have been completed according to the admission, so far as the vendor was concerned, at Whitehall in the State of New York. He was not in Vermont, where the alleged offences were committed. He had no clerk, or agent, or office for the sale of liquors in that State or at any other place than Whitehall. As said by counsel, the

contention of the State appears to have been to make the defendant constructively present in Vermont and by a fiction of law a criminal under her laws. He was, in fact, found guilty of criminal offences in Vermont where he was not present, because he sold liquors in New York on credit to parties in Vermont, payable on delivery.

Transactions like those in controversy, that is, purchases of small quantities of goods upon orders, the packages to be shipped by the vendor with a direction to collect the amount of the price on delivery, take place in this country every month to the amount of millions of dollars. Orders are sent all over the country, for articles of small bulk; to California for fruits and wines, to Florida for oranges, to Kentucky for whiskies, and to the dealers in our large cities in general merchandise for small parcels of different kinds. They are transmitted without hesitation by the vendors upon the receipt of such orders, often even without knowledge of the parties sending them, their security being the retention of a lien upon the property shipped until the cash is actually paid. Amazement would strike the large class of merchants engaged in transmitting goods in this way from one portion of the country to another, if they were told that they thereby rendered themselves liable to the penal statutes of the States to which the goods were sent in compliance with the orders of the purchasers, and might be prosecuted for criminal offences committed in those States, which they had never visited and with whose laws they never intended to interfere. I do not believe that any such danger is incurred by them by engaging in this mode of interstate commerce. None of the cases which I have seen, and my examination has been somewhat extended, has sustained any such doctrine. Whether transactions of the character mentioned are to be deemed absolute sales of the goods on the part of the vendor, with a proviso for withholding their delivery until actual payment, so as to preserve a lien for the price, or only as executory contracts of sale not completed until actual delivery, there is a diversity of opinion. *Pilgreen* v. *The State*, 71 Alabama, 368; *Dutton* v. *Solomonson*, 3 Bos. & Pul. 582; *Garland* v. *Lane*, 46 N. H. 245; *Orcutt*

v. *Nelson*, 1 Gray, 536, 542; and *State* v. *Corl and Tobey*, 43 Arkansas, 353.

But in either view, whether considered as absolute sales or executory contracts of sale, they were, as already stated, transactions of interstate commerce. They were made between citizens of different States, and involved the transportation of the article sold from one State to another. A sale of an article between such citizens and its transportation from one State to another for delivery to the purchaser are the essential elements of interstate commerce. As said by this court in *Welton* v. *State of Missouri*, 91 U. S. 275, 280, commerce "comprehends intercourse for the purposes of trade in any and all its forms, including the transportation, purchase, sale and exchange of commodities between the citizens of our country and the citizens or subjects of other countries, and between the citizens of different States."

In *County of Mobile* v. *Kimball*, 102 U. S. 691, 702, this court said: "Commerce with foreign countries and among the States, strictly considered, consists in intercourse and traffic, including in these terms navigation and the transportation and transit of persons and property, as well as the purchase, sale and exchange of commodities. For the regulation of commerce as thus defined there can be only one system of rules applicable alike to the whole country; and the authority which can act for the whole country can alone adopt such a system. Action upon it by separate States is not, therefore, permissible."

In the case of the *Daniel Ball*, 10 Wall. 557, 565, this court said: "Whenever a commodity has begun to move, as an article of trade, from one State to another, commerce in that commodity, between the States has commenced." See also *Gloucester Ferry Co.* v. *Pennsylvania*, 114 U. S. 196; *Brown* v. *Houston*, 114 U. S. 622; *Pickard* v. *Pullman Southern Car Co.*, 117 U. S. 34; *Robbins* v. *Shelby Taxing District*, 120 U. S. 489; *Steamship Co.* v. *Pennsylvania*, 122 U. S. 326.

The exclusive and protecting power of Congress over interstate commerce is not confined to that commerce which consists of wholesale business, but extends to all cases of the sale,

exchange and transportation of goods between citizens of different States — as much to the single case of fruit or wine as to the carload of grain or cotton.

The transactions considered in this case, which extended over a period of three years, cannot be described without showing that they embody the elements which constitute interstate commerce — sales of goods by a citizen of one State to a citizen of another State and their transportation between the States in their delivery to the purchaser. These facts must have been seen by the Supreme Court of Vermont. They were facts, constantly presenting themselves, and could not have been overlooked. Nor can it make any difference what motives may be imputed to the parties on the one side in selling, and on the other in purchasing the goods; the only inquiry which can be considered, is, were the goods bought and sold subjects of lawful commerce, for if so, they were, in their transportation between the parties — citizens of different States — until their delivery to the purchaser or consignee in the completion of the contracts of sale, under the protection of the commercial power of Congress. It is not necessary, to give this court jurisdiction to review the judgment of that court, that the record should show that the objection that the transactions were those of interstate commerce was specifically taken in terms in the court below; it is sufficient if the facts of the record show that the question of their being transactions of that character was involved in the case, though the court below may state in various forms that it did not deem it necessary to consider it. In *Murray* v. *Charleston*, 96 U. S. 432, 441, it was held that whenever rights, acknowledged and protected by the Constitution of the United States, are denied or invaded by state legislation, which is sustained by the judgment of a state court, this court is authorized to interfere; that the jurisdiction to reëxamine such a judgment cannot be defeated by showing that the record does not in direct terms refer to a constitutional provision, nor expressly state that a Federal question was presented; and that the true jurisdictional test is, whether it appears that such a question was decided adversely to the Federal right. Mr. Justice Strong,

speaking for the court, said : " In questions relating to our jurisdiction, undue importance is often attributed to the inquiry whether the pleadings in the state court, expressly assert a right under the Federal Constitution. The true test is not whether the record exhibits an express statement that a Federal question was presented, but whether such a question was decided, and decided adversely. to the Federal right. Everywhere in our decisions it has been held that we may review the judgments of a state court when the determination or judgment of that court could not have been given without deciding upon a right or authority claimed to exist under the Constitution, laws or treaties of the United States, and deciding against that right. Very little importance has been attached to the inquiry whether the Federal question was formally raised ; " and the court cited the case of *Crowell* v. *Randell*, 10 Pet. 368, in support of this position, where it was laid down after a review of previous decisions " that it is not necessary the question should appear on the record to have been raised and decision made in direct and positive terms *in ipsissimis verbis*, but it is sufficient if it appears by clear and necessary intendment that the question must have been raised, and must have been decided, in order to have induced the judgment." See also *Eureka &c. Canal Co.* v. *Yuba County Superior Court*, 116 U. S. 410 ; *Arrowsmith* v. *Harmoning*, 118 U. S. 194.

If the vendor had, during the same period of three years, sold every third or fourth day a box of fruit or a package of clothing to the vendees in Vermont, payable on delivery, the transactions would have been of the same character as those under consideration — those of interstate commerce — and I doubt whether a question on this point would have been raised by any one. The present transactions, in the fact that the articles are liquors, are in no respect different in character. The decision made by the court below could not have been rendered without its assuming that the facts which constitute interstate commerce were transactions of a different nature.

If that court could, by that assumption, bind this court, the supervising authority of our jurisdiction would be lost in every case by the simple assertion of the court below that it

placed its decision on some particular ground of its own crea-
tion. To assent to any such doctrine would be to abrogate
our jurisdiction in a most important particular. And that is,
in my judgment, exactly what is done in this case. In the
opinion of the majority it is stated that the only question
considered by the Supreme Court of Vermont, in regard to
the present case, was whether the liquor in question was sold
by O'Neil at Rutland or Whitehall, so as to fall within or
without the statute of Vermont, and it arrived at the conclu-
sion that the completed sale was in Vermont. That, says
this court, does not involve any Federal question. To this I
answer, that before the state court could reach the question
whether the sale fell under the law of Vermont it had to
determine whether the sale was completed in that State, or in
New York — whether, therefore, an executory sale of goods
in New York, completed in Vermont, was or was not a trans-
action of interstate commerce, and until that question, which
was a Federal one, was disposed of, the alleged State question
could not be considered. But that the commercial question
was brought to the attention of the Supreme Court of Ver-
mont, was argued by counsel there and passed upon by that
court, does not rest as an inference from the facts necessarily
involved: it appears from its opinion and the official report
of the case.

There were at the same time three other cases before the
court arising upon substantially the same facts; one against
the same respondent and the other two being proceedings
for the condemnation of the liquors seized. They were con-
sidered together, and the opinion of the court, delivered by
its Chief Justice, covered them all and discussed the principal
questions involved. It was prepared by him and handed to
the reporter, and under the latter's supervision it was published
in the official reports of the decisions of the court, and is
found in vol. 58 of the Vermont Reports. The law of Ver-
mont requires the judges of the Supreme Court to prepare
and furnish to the reporter, each year, reports of the opinions
delivered by them, and the reporter to prepare them for pub-
lication and to superintend the printing. In looking at the

synopsis of the argument of counsel, which accompanies the report of the opinion thus prepared, we find that they took the position that the transactions complained of were those of interstate commerce, and that the State could not prohibit or regulate that commerce. In *Kreiger* v. *Shelby Railroad Co.*, 125 U. S. 39, 44, it was held that this court might examine the opinions of a state court, delivered and recorded, to ascertain the ground of its judgment. And looking at the opinion of the Supreme Court of Vermont we find several paragraphs bearing upon the question of interstate commerce. One of the paragraphs describes the sales thus: "The liquors were ordered by residents of Vermont from dealers doing business in the State of New York, who selected from their stock such quantities and kinds of goods as they thought proper in compliance with the terms of the orders, put them up in packages, directed them to the consignees, and delivered them to the express company as a common carrier of goods for transportation, accompanied with a bill or invoice for collection." I am unable to make out of transactions of this character anything other than those of interstate commerce.

In another paragraph the court refers directly to the commercial clause of the Constitution and repudiates its application. It says: "Concerning the claim that section eight of the Federal Constitution, conferring upon Congress the exclusive right to regulate commerce among the States, has application, it is sufficient to say that no regulation of, or interference with, interstate commerce is attempted," and the court concludes its opinion covering all the cases by holding that in the two cases of the *State* v. *O'Neil* the respondent takes nothing by his exceptions. That is to say, the court, not denying that the question was raised in the O'Neil cases, passed it off with the statement that no regulation of or interference with commerce was attempted, thus brushing out of consideration the Federal question by assuming that the transactions were purely of state cognizance. In another paragraph the state court expresses disapprobation of the claim that the Federal authority was supreme in matters of interstate commerce. "If it were competent," said that court, "for persons or com-

panies to become superior to state laws and police regulations, and to override and defy them under the shield of the Federal Constitution, *simply by means of conducting an interstate traffic*, it would indeed be a strange and deplorable condition of things." That is to say, that the importation of goods into the State from another State should be protected under the Federal Constitution against hostile state legislation would be deplorable. This observation was undoubtedly made in response to suggestions that transportation of goods between the States was free until regulated by Congress. Deplorable as the Supreme Court of Vermont may have thought the doctrine, it was the settled law, as announced by repeated decisions of this court. In *County of Mobile* v. *Kimball*, 102 U. S. 691, 697, speaking of the power of Congress over commerce, this court said: " The subjects, indeed, upon which Congress can act under this power are of infinite variety, requiring for their successful management different plans or modes of treatment. Some of them are national in their character, and admit and require uniformity of regulation, affecting alike all the States ; others are local, or are mere aids to commerce, and can only be properly regulated by provisions adapted to their special circumstances and localities. Of the former class may be mentioned all that portion of commerce with foreign countries or between the States which consists in the transportation, purchase, sale and exchange of commodities. Here there can of necessity be only one system or plan of regulations, and that Congress alone can prescribe. *Its non-action in such cases with respect to any particular commodity or mode of transportation is a declaration of its purpose that the commerce in that commodity, or by that means of transportation, shall be free.*"

And in *Leisy* v. *Hardin*, 135 U. S. 100, 119 this court cites from a previous opinion the following language as to the power of Congress over subjects of interstate commerce, declaring that its doctrine is now firmly established: " Where the subject is national in its character, and admits and requires uniformity of regulation, affecting alike all the States, *such as transportation between the States, including the importation of*

*goods from one State into another, Congress can alone act upon it, and provide the needed regulations."* See also *Welton* v. *Missouri,* 91 U. S. 275; and *Brown* v. *Houston,* 114 U. S. 622, 630.

In another paragraph of the opinion the state court again refers to the character of the transaction between the vendor in New York and the vendee in Vermont, and the effect of the instruction to the carrier not to deliver the goods except upon prior or contemporaneous payment of the price, upon which it says: "The contract of sale, therefore, remained inchoate or executory while the goods were in transit, or in the hands of the express company, and could only become executed and complete by their delivery to the consignee. There was a completed executory contract of sale in New York, but the completed sale was, or was to be, in this State," (Vermont). No better description of a transaction of interstate commerce could be given: an executory contract of sale made in one State by a citizen thereof to a citizen of another State, and a completed sale under that contract by the transportation and delivery to the purchaser in the latter State.

In the face of these extracts from the opinion of that court, it strikes me with surprise that any one can contend that in deciding the case it did not consider the question of interstate commerce. It seems to me to have been the principal question before it, and the only one which gave it any trouble in the disposition of the case. But notwithstanding these statements, and the character of the transactions themselves, which do not admit, in my judgment, of any accurate description without involving, necessarily, elements of interstate commerce, the assertion is made by the majority, with great positiveness, as though it would brush aside opposing considerations, that "no Federal question was presented for the decision of the court as to this case, nor was the decision of a Federal question necessary to the determination of this case, nor was any actually decided, nor does it appear that the judgment as rendered could not have been given without deciding one." If this assertion could be received with half the confidence with which it is made, the whole controversy would be settled, and any

discussion upon the points raised would be precluded. The opinion of the court would then stand as evidence of wrongs inflicted upon a citizen of the United States under the forms of law, and, if the decision be right, of the inability of their constituted tribunals to give to him any redress, notwithstanding the often-repeated declaration that the power of Congress over interstate commerce is exclusive of all state authority.

It is true that the presumption of law is that the majority of the court are right and that I am wrong; yet, in the face of this presumption, and the positiveness with which the views of the majority are asserted, I cannot yield my convictions the other way, which were never clearer or stronger in any case.

I can conceive of nothing more direct and effective as an interference with the power of Congress over interstate commerce than for a State to hold that the act of transmitting an article to it from another State, in completion of a sale by delivery, is an offence against its laws for which the sender can be punished. Surely commerce between the States would be defeated entirely, or subject to the control of a State to which property might be sent, if it could hold the consummation of the sale of the article sent from another State to be itself a penal offence. And to say that there is no interference in such a case with the power of Congress is, in my humble judgment, and with all due respect to my associates, to trifle with substance by words.

Until Congress acts, every citizen in a State has a right to send lawful articles of commerce into another State. When they reach that State, and become a part of the general property there, they fall under the control of its lawfully established police regulations; but the commerce, which is subject to the control of Congress, necessarily carries the article into another State, and whether the title is vested in the purchaser there or when it starts from the State from which it is sent, is a matter of no consequence; the state power over the article only commences after it is once incorporated into the property of the State, and that does not take place until the transportation is completed and the delivery made. Interstate commerce is not confined to the sale of goods which have been fully paid

for before they leave the State of export. It embraces also goods the sale of which may not be completed until delivery in the State of import; and the distinction in that respect made by the Supreme Court of Vermont would destroy half of the interstate commerce of the country. To regulate commerce is to prescribe .e rules by which it shall be governed, .. is, ᴜhe conditions on which it shall be carried on, whether it shall be subject to duties and charges or be left free and untrammelled.

The necessity of some controlling power to regulate commerce both with foreign nations and among the States was one of the principal causes that led to the calling of the convention which adopted the present Constitution. As said by Chief Justice Marshall in *Brown* v. *Maryland*, 12 Wheat. 419, 445: " The oppressed and degraded state of commerce, previous to the adoption of the Constitution can scarcely be forgotten. It was regulated by foreign nations, with a single view to their own interests; and our disunited efforts to counteract their restrictions were rendered impotent by want of combination. Congress, indeed, possessed the power of making treaties; but the inability of the Federal government to enforce them had become so apparent as to render that power in a great degree useless. Those who felt the injury arising from this state of things, and those who were capable of estimating the influence of commerce on the prosperity of nations, perceived the necessity of giving the control over this important subject to a single government. It may be doubted whether any of the evils proceeding from the feebleness of the Federal government contributed more to that great revolution which introduced the present system than the deep and general conviction that commerce ought to be regulated by Congress. It is not, therefore, matter of surprise, that the grant should be as extensive as the mischief, and should comprehend all foreign commerce and all commerce among the States. To construe the power so as to impair its efficacy, would tend to defeat an object, in the attainment of which the American public took, and justly took, that strong interest which arose from a full conviction of its necessity."

And in *Welton* v. *State of Missouri*, 91 U. S. 275, 281, this court said: "The power which insures uniformity of commercial regulation must cover the property which is transported as an article of commerce from hostile or interfering legislation, until it has mingled with and become a part of the general property of the country, and subjected like it to similar protection, and to no greater burdens. *If, at any time before it has thus become incorporated into the mass of property of the State or nation, it can be subjected to any restrictions by state legislation, the object of investing the control in Congress may be entirely defeated.*"

To sanction, therefore, the legislation of Vermont making the consummation of an act of interstate commerce, that is, the delivery of the article sold or agreed to be sold in another State to the purchaser or intended purchaser in Vermont, a penal offence, is, in fact, to defeat the very object of the grant to Congress. The decision of the Supreme Court of that State conflicts with a long line of previous decisions of this court running through the last quarter of a century, and with those of *Bowman* v. *Chicago &c. Railway Co.*, 125 U. S. 465, and *Leisy* v. *Hardin*, 135 U. S. 100, since rendered, in which the power of Congress over commerce, foreign and interstate, has been exhaustively considered and doctrines declared covering every possible position that can be taken in this case.

In *Bowman* v. *Chicago, &c. Railway Co.* a law of Iowa forbidding, under penalties, common carriers to bring intoxicating liquors into the State from any other State or Territory, without being first furnished with a prescribed certificate, was declared invalid, because essentially a regulation of commerce among the States, and not sanctioned by the authority, express or implied, of Congress. It was accordingly held that this law could give no protection to the carrier in refusing to transport the goods into that State as requested by the shipper.

If requiring such a certificate as a condition for the importation of goods into a State was invalid as a regulation of commerce, much more so must a law be, which makes such importation upon a sale, not completed until by a delivery of the goods within the State to which they are transported, a

penal offence, subjecting the importer to a criminal prosecution for the importation. The law of Vermont would have afforded no protection to the express company employed to transport the goods in question into that State had it refused to carry them. The vendor could have sued that company and recovered for not carrying them. How, then, can he be prosecuted for sending the goods by that company? How can a penalty be imposed upon him for doing what he could compel the company to do? To the objection urged that there was no legislation of Congress with which the act of Iowa conflicted, the court said: "If not in contravention of any positive legislation by Congress, it is, nevertheless, a breach and interruption of that liberty of trade which Congress ordains as the national policy, by willing that it shall be free from restrictive regulations." 125 U. S. 498.

In *Leisy* v. *Hardin* the court said, giving expression to its often-repeated declarations, that the power vested in Congress to regulate commerce was complete in itself, acknowledging no limitations other than those prescribed in the Constitution, and was coëxtensive with the subjects on which it acted and could not be stopped at the external boundary of a State, but must enter its interior and be capable of authorizing the disposition of those articles which it introduced, so that they might become mingled with the common mass of property there.

These doctrines, thus clearly stated and supported by an almost unbroken line of decisions of this court for half a century, establish the invalidity of the action of the State of Vermont in making a sale of goods by a non-resident to its citizens, completed on the delivery of the property to them in the State, a penal offence.

It is true that when the decisions in these last two cases were rendered the personnel of this court was different from what it is at present. When *Bowman* v. *Chicago &c. Railway Co.* was decided, Justices Matthews, Miller and Bradley were members of this court and concurred in the decision. And when *Leisy* v. *Hardin* was decided the latter two Justices were still members and concurred in that decision.

These Justices were distinguished for their ability and learning, and it was the occasion of great pride to them that they had contributed by their labors to establish that freedom of interstate commerce from state interference which made the different States, commercially, one country. As said by Mr. Justice Bradley in *Robbins* v. *Shelby Taxing District*, 120 U. S. 489, 494 : "In the matter of interstate commerce the United States are but one country, and are, and must be, subject to one system of regulations, and not to a multitude of systems." They recognized, with their associates, the right of the State to exercise its police power to the fullest extent, which the health, safety and good order of its people might require, over all property brought from another State within its limits when once mingled with its general property. But they did not admit that the police power of a State was superior to an express power of Congress, and a majority of the court then agreed with them. They respected the declaration of the Constitution that not only that instrument but that all laws of the United States passed in pursuance thereof were the supreme law of the land, and that the judges of every State were bound thereby, anything in the constitution or laws of any State to the contrary. (See Constitution, Art. VI.) They regarded the police power as complete upon all subjects to which it was applicable, but held that it could not be exercised so as to take property, which was an article of commerce, from the regulation of Congress. And on the subject of the relation to each other of the two powers, the police power of the State and the power of Congress over commerce, they often referred to the observations of Mr. Justice Catron, in *The License Cases*, 5 How. 504, 600, that that which from its nature or its condition, from putrescence or other cause, does not belong to commerce is within the jurisdiction of the police power; and that which does belong to commerce is within the jurisdiction of the United States, and that it is not within the power of the State, by its declaration, to determine what is and what is not an article of lawful commerce and thus determine what is and what is not exclusively under its control. Referring to the assumption of such power, that

learned Justice said: "Upon this theory, the power to regu-
late commerce, instead of being paramount over the subject,
would become subordinate to the state police power; for it is
obvious that the power to determine the articles which may
be the subjects of commerce, and thus to circumscribe its
scope and operation, is, in effect, the controlling one. The
police power would not only be a formidable rival, but, in a
struggle, must necessarily triumph over the commercial power,
as the power to regulate is dependent upon the power to fix
and determine upon the subjects to be regulated."

These three Justices are no longer members of this court,
but since they ceased to be members there has been no adjudi-
cation by it until the decision in this case, which, in any respect,
changes its previous decisions upon the exclusive power of Con-
gress over interstate commerce.

In *Chapman* v. *Goodnow*, 123 U. S. 541, 548, this court, in
considering section 709 of the Revised Statutes, providing for
a review of the final judgment or decree in a suit in the highest
court of a State, and speaking of the right or immunity which
might be claimed under the Constitution, or a treaty, or statute
of the United States, and the decision against them, which
would authorize the reëxamination of the judgment or decree,
said: "We are aware that a right or immunity set up or
claimed under the Constitution or laws of the United States
may be denied as well by evading a direct decision thereon as
by positive action. If a Federal question is fairly presented
by the record, and its decision is actually necessary to the
determination of the case, a judgment which rejects the claim,
but avoids all reference to it, is as much against the right,
within the meaning of § 709 of the Revised Statutes, as if it
had been specifically referred to and the right directly refused."
Here the claim was rejected, though all reference to it was
not avoided. Jurisdiction therefore attached. Having juris-
diction to review the judgment for the denial by the state
court of the exclusive power vested in Congress to regulate
commerce among the States, there ought not to be any hesi-
tation in declaring that the judgment of the state court should
for that reason be reversed. If not reversed of what avail

will it be to say that the power of Congress to regulate inter-state commerce is exclusive of all state interference, and that parties dealing in such commerce are protected thereby, when the State can, at any moment, nullify such power by declaring that the delivery of the articles of commerce to parties within the respective States, in completion of a sale made to them in other States, shall constitute a penal offence, and no redress is left to the parties prosecuted? I can never assent to the assumption by the State of any such power as is here asserted.

And I go further than the consideration of the question of interstate commerce involved. Having jurisdiction of the case on the ground stated, I think we may look into the whole record. And if it appears from the proceedings taken and the rulings made in the court below, on questions brought to its notice, that the rights of the accused, affecting his liberty or his life, have been invaded, this court may exercise its jurisdiction for the correction of the errors committed. The Fourteenth Amendment declares that no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, and that no State shall deprive any person of life, liberty or property without due process of law. I agree, as held in *In re Rahrer*, 140 U. S. 545, that those inhibitions do not invest Congress with any power to legislate upon subjects which are within the domain of state legislation. They only operate as restraints upon state action, like the prohibitions upon legislation by the States impairing the obligation of contracts, or to pass a bill of attainder or an *ex post facto* law. But in all cases touching life or liberty I deem it the duty of this court, when once it has jurisdiction of a case, to enforce these restraints for the protection of the citizen where they have been disregarded in the court below, though called to its attention. I do not pretend that this court should take up questions not arising upon the record, but I do contend that it is competent for the court when once it has acquired jurisdiction of a case to see that the life or liberty of the citizen is not wantonly sacrificed because of some imperfect statement of the party's rights. We have now jurisdiction to hear writs of error in certain criminal

cases.　If such a case were brought before us upon objections
to the admission of testimony and we should come to the con-
clusion that the objections were not tenable, but, at the same
time, should perceive that the law, under which the accused
was convicted, had been repealed or amended in the punish-
ment imposed, we should not perform our whole duty if we
allowed the party to be punished under the law repealed or
with greater severity than the amended law authorized, simply
because the precise objection was not taken in direct terms in
the assignments of error.　We should allow additional assign-
ments to be filed, or take notice of the error of our own motion
under Rule 21 stated below, that injustice and wrong may not
be perpetuated.

Section 997 of the Revised Statutes requires that there
shall be annexed to and returned with a writ of error for the
removal of a cause an assignment of errors, and Rule 21 of
this court declares that when there is no assignment of errors,
as required by that section, counsel will not be heard, *except
at the request of the court*, and that errors not specified accord-
ing to the rule will be disregarded.　It adds, however, *that the
court at its option may notice a plain error not assigned or
specified.*　This rule seems to provide for a case like the pres-
ent; and I do not think we should be astute to avoid jurisdic-
tion in a case affecting the liberty of the citizen.

In opening the record in this case, we not only see that the
exclusive power of Congress to regulate commerce was in-
vaded, but we see that a cruel as well as an unusual punish-
ment was inflicted upon the accused, and that the objection
was taken in the court below, and immunity therefrom was
specially claimed.　The Eighth Amendment of the Constitu-
tion of the United States, relating to punishments of this kind,
was formerly held to be directed only against the authorities
of the United States, and as not applicable to the States.
*Barron* v. *Baltimore*, 7 Pet. 243.　Such was undoubtedly the
case previous to the Fourteenth Amendment, and such must
be its limitation now, unless exemption from such punishment
is one of the privileges or immunities of citizens of the United
States, which can be enforced under the clause, declaring that

"no State shall make or enforce any law which shall abridge" those privileges or immunities. In *Slaughter-House Cases*, 16 Wall. 36, it was held that the inhibition of that Amendment was against abridging the privileges or immunities of citizens of the United States as distinguished from privileges and immunities of citizens of the States. Assuming such to be the case, the question arises: What are the privileges and immunities of citizens of the United States which are thus protected? These terms are not idle words to be treated as meaningless, and the inhibition of their abridgment as ineffectual for any purpose, as some would seem to think. They are of momentous import, and the inhibition is a great guaranty to the citizens of the United States of those privileges and immunities against any possible state invasion. It may be difficult to define the terms so as to cover all the privileges and immunities of citizens of the United States, but after much reflection I think the definition given at one time before this court by a distinguished advocate — Mr. John Randolph Tucker, of Virginia — is correct, that the privileges and immunities of citizens of the United States are such as have their recognition in or guaranty from the Constitution of the United States. *Spies* v. *Illinois*, 123 U. S. 131, 150. This definition is supported by reference to the history of the first ten Amendments to the Constitution, and of the Amendments which followed the late Civil War. The adoption of the Constitution, as is well known, encountered great hostility from a large class, who dreaded a central government as one which would embarrass the States in the administration of their local affairs. They contended that the powers granted to the proposed government were not sufficiently guarded, and might be used to encroach upon the liberties of the people. In the conventions of some of the States which ratified the Constitution a desire was expressed for Amendments declaratory of the rights of the people and restrictive of the powers of the new government, in order, as stated at the time, to prevent misconception or abuse of its powers. The desire thus expressed subsequently led to the adoption of the first ten Amendments. Some of these contain specific restrictions upon Congress; as

that it shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances. Some of them impliedly restrict the powers of Congress in prescribing or construing particular modes of procedure, such as require a presentment or an indictment of a grand jury for the trial of a capital or otherwise infamous crime, and the one that provides that in suits at common law, where the value involved exceeds twenty dollars, the right of trial by jury shall be preserved. Some of them are declaratory of certain rights of the people which cannot be violated, as their right to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures; that no one shall be subject for the same offence to be twice put in jeopardy of life or limb, nor be compelled in any criminal case to be a witness against himself; that in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed; and to be informed of the nature and cause of the accusation; and to be confronted with the witnesses against him; and to have compulsory process for obtaining witnesses in his favor; and that excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

The rights thus recognized and declared are rights of citizens of the United States under their Constitution which could not be violated by Federal authority. But when the late civil war closed, and slavery was abolished by the Thirteenth Amendment, there was legislation in the former slaveholding States inconsistent with these rights, and a general apprehension arose in a portion of the country — whether justified or not is immaterial — that this legislation would still be enforced and the rights of the freedmen would not be respected. The Fourteenth Amendment followed, which declares that " all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." The

freedmen thus became citizens of the United States and entitled in the future to all the privileges and immunities of such citizens. But owing to previous legislation many of those privileges and immunities, if that legislation was allowed to stand, would be abridged; therefore, in the same Amendment by which they were made citizens, it was ordained that " no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States," thus nullifying existing legislation of that character, and prohibiting its enactment in the future.

While, therefore, the ten Amendments, as limitations on power, and, so far as they accomplish their purpose and find their fruition in such limitations, are applicable only to the Federal government and not to the States, yet, so far as they declare or recognize the rights of persons, they are rights belonging to them as citizens of the United States under the Constitution; and the Fourteenth Amendment, as to all such rights, places a limit upon state power by ordaining that no State shall make or enforce any law which shall abridge them. If I am right in this view, then every citizen of the United States is protected from punishments which are cruel and unusual. It is an immunity which belongs to him, against both state and Federal action. The State cannot apply to him, any more than the United States, the torture, the rack or thumbscrew, or any cruel and unusual punishment, or any more than it can deny to him security in his house, papers and effects against unreasonable searches and seizures, or compel him to be a witness against himself in a criminal prosecution. These rights, as those of citizens of the United States, find their recognition and guaranty against Federal action in the Constitution of the United States, and against state action in the Fourteenth Amendment. The inhibition by that Amendment is not the less valuable and effective because of the prior and existing inhibition against such action in the constitutions of the several States. The Amendment only gives additional security to the rights of the citizen. It was natural that it should forbid the abridgment by any State of privileges and immunities which the

Constitution recognized and guaranteed as rights of citizens of the United States. A similar additional guaranty of private rights is found in other instances. An inhibition is contained in. the several state constitutions against their legislatures passing a bill of attainder or an *ex post facto* law, and yet a like inhibition against state action is embodied in the Constitution of the United States.

When the objection was taken in the Supreme Court of Vermont that the punishment imposed by the county court was cruel and unusual and immunity from it was specially claimed, the answer of the court was that the punishment could not be said to be excessive or oppressive because the defendant had committed a great many offences; that if the penalty was unreasonably severe for a single offence the constitutional question might be urged, but that its unreasonableness was only in the number of offences which he had committed. I do not think this answer satisfactory. The inhibition is directed against cruel and unusual punishments, whether inflicted for one or many offences. A convict is not to be scourged until the flesh fall from his body and he die under the lash, though he may have committed a hundred offences, for each of which, separately, a whipping of twenty stripes might be inflicted. An imprisonment at hard labor for a few days or weeks for a minor offence may be within the direction of a humane government — but if the minor offences are numerous no authority exists to convert the imprisonment into one of perpetual confinement at hard labor such as would be appropriate only for felonies of an atrocious nature. It is against the excessive severity of the punishment, as applied to the offences for which it is inflicted, that the inhibition is directed.

I think the plaintiff in error should be allowed, under the 21st rule, to amend his assignment of errors, so as to present this objection for our consideration, or, that this court, under that rule, without any additional assignment, should take notice of the error, of its own motion; for if the denial by the court below of the immunity claimed against the cruel and unusual punishment imposed was an error, it was one of the gravest character, leaving the defendant to a life of mis-

ery — one of perpetual imprisonment and hard labor. The right of the court to consider this alleged error of its own motion is within its authority under the 21st rule, and considering the unprecedented severity of the punishment — fifty-four years' imprisonment at hard labor for these transactions, which no power of the human intellect can accurately describe except as transactions of interstate commerce — a punishment which makes the offences infamous crimes, I should have thought that the court would have been prompt to listen to anything which could be properly said for the relief of the defendant.

Here this dissenting opinion might close, as I have touched upon the two questions specially brought to the attention of the court below; but there are some expressions in the opinion of the court upon the procedure in the state courts to which I cannot assent, and these I will briefly notice.

The complaint against the accused describes, as I have said, only a single offence, that of selling, furnishing and giving away intoxicating liquor without authority. It designates no person or persons to whom such liquor was sold, furnished or given away, nor specifies any number of offences, but charges that the offence named was committed "at divers times." And yet he was tried and convicted under this complaint of three hundred and seven distinct offences, and punishment was imposed for each one. To the defective character of the complaint the majority of the court say, in their opinion, as though it was a sufficient answer, that the form of the complaint is authorized by the laws of Vermont, and that under it any number of offences may be proved; and that, as the accused did not take the point either before the justice of the peace or the county court that there was any defect or want of fulness in the complaint, such point was waived. To this I answer that the fact that the legislature of Vermont may have authorized the loose form of accusation used, and allowed the trial of a multitude of offences under an imperfect description of one, does not render the proceeding due process of law any more than if it had attempted to authorize trials of criminal offences without any accusation in writing. Due process

of law required a specific description of all the offences for which the defendant was to be put on trial. Proceeding without it was not due process of law; and, in my judgment, no legislation of Vermont could make it so. And it is to me a surprising doctrine that a party can be tried for and convicted of a criminal offence not alleged against him, and afterwards, when the sentence is attempted to be enforced, can be prevented from taking the objection that no offence was charged in the accusation, because no defect of that kind was urged at the trial. So far from the defect being waived, or he being then estopped from insisting upon the objection by his previous silence, I think he could justly claim that the whole proceeding was a nullity, a mere mockery of justice.

It is the established rule of the common law, which has prevailed in England and in this country since the revolution of 1688, if not for a period anterior to it, that in all criminal prosecutions the accused must be informed of the nature and cause of the accusation against him. It is the law of every civilized community, and *in no case can there be, in criminal proceedings, due process of law where the accused is not thus informed.* The information which he is to receive is that which will acquaint him with the essential particulars of the offence, so that he may appear in court prepared to meet every feature of the accusation against him. As said by Chief Justice Gibson of the Supreme Court of Pennsylvania in *Hartmann* v. *Commonwealth*, 5 Penn. St. 60, 66: "Precision in the description of the offence is of the last importance to the innocent; for it is that which marks the limits of the accusation and fixes the proof of it. It is the only hold he has on the jurors, judges as they are of the fact and the law."

MR. JUSTICE HARLAN, with whom concurred MR. JUSTICE BREWER, dissenting.

I do not think that this writ of error should be dismissed for want of jurisdiction.

The Supreme Court of Vermont, at its October term, 1885, decided the following cases: *State* v. *O'Neil.* No. 27, the pres-

ent case, in which the respondent was charged with selling intoxicating liquors contrary to law; *State* v. *O'Neil*, No. 28, in which he was charged with keeping intoxicating liquors with intent to sell, etc.; *State* v. *Four Jugs of Intoxicating Liquor, National Express Co., Claimant*, No. 25; *State* v. *Sixty-eight Jugs of Intoxicating Liquor, National Express Co., Claimant*, No. 26. They were disposed of at the same time, and in one opinion delivered by Chief Justice Royce. *State* v. *O'Neil*, 58 Vermont, 140, 150, 151, 166. It is shown by the report of the cases that O'Neil expressly invoked for his protection that clause of the Constitution of the United States which gives Congress power to regulate commerce among the States. His exception was in these words: "The State cannot prohibit or regulate interstate commerce." We give the very words of the exception, because of the statement in the opinion of this court that no such point was passed upon in this case by the Supreme Court of Vermont. 58 Vermont, 150. A like exception was taken by the claimant in cases Nos. 25 and 26, in these words: "Congress has exclusive power to regulate commerce among the States." 58 Vermont, 154. In disposing of this question, the court, in its opinion, common to all the cases before it, among other things, said: "If it were competent for *persons* or companies to become superior to state laws and police regulations, and to override and defy them under the shield of the Federal Constitution simply by means of conducting an interstate traffic, it would indeed be a strange and deplorable condition of things. The right of the States to regulate the traffic in intoxicating liquors has been settled by the United States Supreme Court in the *License Cases*, 5 How. 577." The opinion closed with these words: "The result is that in the cases of the *State* v. *O'Neil*, numbers 27 and 28, the respondent takes nothing by his exceptions; and in the cases of the *State* v. *Intoxicating Liquor, National Express Company, Claimant*, numbers 25 and 26, the judgments are affirmed." And one of the assignments of error in this court is to the effect that the court below erred in adjudging that the statute of Vermont, in its application to the facts of this case, was not in conflict with the commerce

clause of the Constitution of the United States. How, then, can this court decline to consider the question, distinctly raised by O'Neil in the court below, as well as here, namely, that the transactions on account of which he was prosecuted constituted interstate commerce, which was not subject to regulation by the State? The defendant having expressly excepted to the judgment against him upon the ground that it was not consistent with the power of Congress over commerce among the States, and the Supreme Court of Vermont having adjudged that he could take nothing by his exception, how can it be said that this question was not presented to and was not determined by that court adversely to the accused?

But if it were true that the court below did not, in fact, pass upon, but ignored, this question, with respect to O'Neil, and restricted its observations to the cases in which the National Express Company was claimant, it would not follow that this court is without jurisdiction to determine it. We have often held that a judgment of the highest court of the State which failed to recognize a Federal right, specially set up and claimed, ought not to be disturbed, unless its *necessary effect* was to deny that right, or where it proceeded, in part, upon another and distinct ground, not involving a Federal question, but sufficient, *in itself*, to maintain the judgment without reference to that question. *San Francisco* v. *Itsell*, 133 U. S. 65, 66; *Beaupré* v. *Noyes*, 138 U. S. 397, 401. Now, it may be true, as I think it is, under the facts of this case, that the title to the liquors sold by O'Neil did not pass, and he did not intend it should pass, from him upon the delivery to the express company, in New York, of the jugs or vessels containing the liquors, and, therefore, that the sales were not, in law, consummated until the liquors were received in Vermont and paid for there by the vendee. Still, the question remained, whether the sending of the liquors from Whitehall, New York, to Rutland, Vermont, was or was not interstate commerce protected by the Constitution of the United States. The contention of the defendant in this court, as it was in the court below, is, that, even if the sales were not consummated until the liquors were delivered to the respective vendees, he had

the right, under that instrument, to send the liquors into Vermont, and deliver them there, in the original packages, that is, in jugs or other vessels, upon payment of the price charged. And the necessary effect of the judgment was to deny this right, thus distinctly asserted. The decision that the sales were consummated in Vermont, and, consequently, that the defendant violated the laws of that State in doing what he did there, by his agents, is not, in itself, sufficient to support the judgment, except upon the theory that he had no right, under the Constitution of the United States, to send the liquors into Vermont to be there delivered in the original packages. It seems to me entirely clear, in any view of the case, that the court below necessarily determined, adversely to the defendant, a right specially set up and claimed by him under the Federal Constitution.

In view of what I have said, it is proper to state that, in my judgment, the sending by the defendant from Whitehall, New York, to Rutland County, Vermont, of intoxicating liquors, in jugs, bottles or flasks, to be delivered only upon the payment of the price charged for the liquors, were not, in any fair sense, transactions of interstate commerce protected by the Constitution of the United States against the laws of Vermont regulating the selling, giving away and furnishing of intoxicating liquors within its limits. The defendant, in effect, engaged in the business of selling, through agents, by retail, in Vermont, intoxicating liquors shipped by him, for that purpose, into that State from another State. What he did was a mere device to evade the statutes enacted by Vermont for the purpose of protecting its people against the evils confessedly resulting from the sale of intoxicating liquors. The doctrine relating to "original packages" of merchandise sent from one State to another State does not embrace a business of that character. But whether this be so or not is a question this court has jurisdiction to determine in the present case, and it is clearly the right of the defendant to have it determined If the jugs, bottles or flasks, containing intoxicating liquors sent into Vermont from the defendant's place of business over the border, were original packages, the shipment of which

into that State, prior to the passage of the Act of Congress of August 8th, 1890, c. 728, 26 Stat. 313, known as the Wilson statute, was protected by the Constitution of the United States against state interference until delivered to the consignees, he is entitled upon the principles announced in *Leisy* v. *Hardin*, 135 U. S. 100, to a reversal of the judgment.

But there is another reason why this writ of error should not be dismissed for want of jurisdiction. The defendant contended in the court below that the judgment of the Rutland County Court inflicted upon him, in violation of the Constitution of the United States, a punishment both cruel and unusual. It is not disputed that he distinctly made this point. And the question was decided against him in the court below. It is true the assignments of error do not, in terms, cover this point, but it is competent for this court to consider it, because we have jurisdiction of the case upon the grounds already stated. I fully concur with Mr. Justice Field, that since the adoption of the Fourteenth Amendment, no one of the fundamental rights of life, liberty or property, recognized and guaranteed by the Constitution of the United States, can be denied or abridged by a State in respect to any person within its jurisdiction. These rights are, principally, enumerated in the earlier Amendments of the Constitution. They were deemed so vital to the safety and security of the people, that the absence from the Constitution, adopted by the convention of 1787, of express guarantees of them, came very near defeating the acceptance of that instrument by the requisite number of States. The Constitution was ratified in the belief, and only because of the belief, encouraged by its leading advocates, that, immediately upon the organization of the Government of the Union, Articles of Amendment would be submitted to the people, recognizing those essential rights of life, liberty and property which inhered in Anglo-Saxon freedom, and which our ancestors brought with them from the mother country. Among those rights is immunity from cruel and unusual punishments, secured by the Eighth Amendment against Federal action, and by the Fourteenth Amendment against denial or abridgment by the States. A

judgment, therefore, of a state court, even if rendered pursuant to a statute, inflicting or allowing the infliction of a cruel and unusual punishment, is inconsistent with the supreme law of the land. The judgment before us by which the defendant is confined at hard labor in a House of Correction for the term of 19,914 days, or fifty-four years and two hundred and four days, inflicts punishment, which, in view of the character of the offences committed, must be deemed cruel and unusual.

Without noticing other questions, I am of opinion that upon the ground last stated the judgment should be reversed.

Mr. Justice Brewer authorizes me to say that in the main he concurs with the views expressed in this opinion.