Albert SIMPSON, Appellant,

v.

The STATE of Texas, Appellee.

No. 01–83–0368–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

April 12, 1984.

David Ball, Jr., Houston, for appellant.

Timothy G. Taft, Houston, for appellee.

Before EVANS, C.J., and DOYLE and LEVY, JJ.

## OPINION

EVANS, Chief Justice.

A jury found appellant guilty of possession of cocaine, and upon finding enhancement allegations of two prior felony convictions to be true, assessed appellant's punishment at life imprisonment as required by Tex.Penal Code sec. 12.42(d).

In five grounds of error, the appellant claims that the trial court's denial of his motion to suppress certain evidence was reversible error; that the evidence is insuf-

ficient to support the jury's verdict; that the jury's verdict was coerced; and that his life sentence violates the Eighth Amendment prohibition of cruel and unusual punishment.

On November 24, 1982, around one o'clock in the morning, a Houston police patrol car en route to a call passed a 24-hour car wash located in a high crime area. The two officers noted a car parked in the far stall of the car wash and agreed to investigate if the car was still there on their return trip. Less than a half hour later, they again passed the car wash and as they drove up to investigate, saw people in the parked car. Officer Williams, the passenger in the patrol car, testified that his partner turned off their lights as they drove up and parked out of sight. He then approached the car from the front with his gun drawn and saw three people, two in front and one in the back seat on the passenger side. When he identified himself, the driver put the car in reverse and attempted to flee. However, Officer Mercer, who had circled around to the rear of the car, cut off their escape.

Both officers testified that the lights were not working in the stall where the car had been parked. Officer Mercer testified that as he approached the car, he saw appellant in the back seat with a syringe in his arm. The officer said that when the appellant saw the officer, he removed the syringe, "spurting blood" from his arm. The officers also testified that they found at least one syringe, possibly more, and one bottle cap with a liquid substance in the front seat of the car, and one syringe and another cap with liquid on the floorboard of the back seat. At trial, the bottle cap from the back seat was introduced as State's Exhibit No. 2, and testimony was given indicating that a field test had been made of the contents of that cap. However, those results are not in the trial record. State's Exhibit No. 3, another cap allegedly found in the vicinity of appellant, was determined by a police chemist to contain .0095 grams of cocaine. Since the police only claimed to have found two caps with liquid in them, and the contents of the one in the backseat were allegedly used in

a field test, the only proof of a controlled substance in the record concerns the contents of a bottle cap found in the front seat of the car.

The appellant contends that the trial court erred in denying his motion to suppress the evidence obtained as a result of the search of the vehicle in the car wash stall. He points to the testimony of Officer Williams, indicating that he became suspicious of the automobile because "it was just sitting there without any occupants that he could see and was not being washed." The appellant contends that these facts did not justify the officers' investigation which resulted in the arrest, search, and seizure of the caps and syringes in the car.

We overrule this contention. The facts clearly indicate that the officers took swift action predicated upon on-the-spot observations, *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). Under the guidance of *Terry*, we have examined the behavior that first aroused the officers' suspicions, the neighborhood or context in which the behavior occurred, and the officer's experience, to determine whether the "specific and articulable" facts on which the officers relied in fact justified the intrusion made. 392 U.S. at 22–23, 88 S.Ct. at 1880–1881. The initial specific and articulable fact relied on by the officers was that a car was parked in a poorly-lit stall of a car wash, and was not being washed. The officers testified that the car wash was located in a high crime area where drug use and car theft were prevalent, and that they were experienced in patrolling this area for such crimes. In light of the legitimate governmental interest in detecting and preventing such crimes, and because the presence of the car at such location and time of night was not equally consistent with legal behavior, we conclude that the officers had specific and articulable suspicions sufficient to justify their investigation. *Cf. Schwartz v. State*, 635 S.W.2d 545 (Tex.Cr.App.1982).

Having determined that the officers' actions were justified at their incep-

tion, we next consider whether their subsequent actions were "reasonably related in scope to the circumstances which justified interference in the first place." *Terry*, 392 U.S. at 20, 88 S.Ct. at 1878. As the officers approached the car to investigate, it became apparent that there were people in the car. When an officer is justifiably investigating the situation that aroused his articulable suspicions, he is entitled to proceed in a manner that minimizes his personal risk. Under the circumstances reflected by the record, we conclude that the manner in which the officer accosted the occupants of the car was justified, and that when the driver of the car attempted to flee, and the officer observed evidence of drug use, there was probable cause for the arrest of the occupants. The search of the car incident to the arrest was therefore legal, and the evidence seized as a result of that search and in plain view was properly admitted at trial. We accordingly hold that there was sufficient evidence of specific and articulable circumstances to justify the initial investigation and stop, and the appellant's first ground of error is overruled.

The appellant also challenges the sufficiency of the evidence to support his conviction on the grounds that the State failed to establish his possession of the contraband found in the car, and that the amount of cocaine seized was too small to constitute an offense.

■ A police chemist testified that the "cooker" submitted to him for testing contained 9.5 milligrams (.0095 grams) of cocaine. It has been held that 3.2 milligrams of contraband is sufficient to uphold a conviction under the Controlled Substances Act, Tex.Rev.Civ.Stat. art. 4476–15 sec. 4.04(b). *Kent v. State*, 562 S.W.2d 855 (Tex.Cr.App.1978). We therefore overrule appellant's fifth ground of error.

■ We also hold that the evidence is sufficient to prove that appellant was in possession of the contraband seized. Possession of a controlled substance is defined as the "actual care, custody, control or management", and possession is a crime if the accused knew it was a controlled substance. Article 4476–15 sec. 4.04(a). The State was not required to prove that the appellant was actually holding the cap of cocaine, but was required to offer evidence which affirmatively linked him to the contraband, proving beyond a reasonable doubt his knowledge and possession. *Rodriguez v. State*, 635 S.W.2d 552, 553 (Tex. Cr.App.1982). There is testimony that a bottle cap, with a substance the officers believed to be controlled, was found in the backseat area where defendant was the sole occupant. The bottle cap in the front seat was shown to contain 9.5 milligrams of cocaine. The officer testified that at the time of appellant's arrest, he had a syringe in his arm. The only reasonable inference to be drawn from this evidence is that the appellant was using cocaine. This use sufficiently links the appellant to the cocaine seized to prove possession. We overrule appellant's third ground of error.

We next consider the appellant's contention that the trial court committed reversible error during the jury's deliberation, resulting in a coerced verdict.

The record reflects that the trial lasted less than two days. The jury began its deliberations about 11:30 a.m. on the second day, and during the afternoon, the court brought in the jury and asked the foreman how they were divided. The foreman replied that they were divided 11 to 1 at that time. Later that afternoon, the jury apparently sent a note to the court, which does not appear in the record, and the court again brought in the jury. The court advised the jury that it had received the note and that the court did not feel that the jury had then deliberated a sufficient time for the court to decide that a mistrial was in order. The court was then recessed, and the jury's deliberations did not resume until some six days later because of a death in the family of one of the jurors. At that time, the jury had deliberated one afternoon. After the six-day recess, the jury continued its deliberations and at about 11:00 a.m., the jury foreman sent a note to the court stating "the jury finds it impossible to reach a decision at this time." The court responded, over appellant's ob-

jection, with the following additional instruction:

### MEMBERS OF THE JURY:

It would be necessary for the Court to declare a mistrial if the jury found itself unable to arrive at a unanimous verdict after a reasonable length of time. The indictment will still be pending, and it is reasonable to assume the case will be tried again with the same questions to be determined by another jury and with no reason to hope such other jury would find the questions any easier to decide. The length of time the jury would be required to deliberate is within the discretion of the Court, and the Court does not at present feel the jury has deliberated a sufficient length of time to fully eliminate the possibility of its being able to arrive at a verdict.

You are admonished to follow your oath as jurors and to render a true verdict based on the law and the evidence you heard so help you God.

At noon, yet another note from the jury was sent to the court, stating "the jury has not been able to reach a decision as to guilty or not guilty." Finally, at 1:50 p.m., the jury returned a verdict of guilty.

▪ The appellant does not cite any authorities to support his argument that the trial court committed reversible error in submitting the additional instruction to the jury. As the State correctly points out, this type of additional instruction was approved by the U.S. Supreme Court long ago in *Allen v. U.S.*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), and has been upheld by the Texas Court of Criminal Appeals in *Arrevalo v. State*, 489 S.W.2d 569 (Tex.Cr. App.1973), and later by this court in *Love v. State*, 627 S.W.2d 457 (Tex.App.—Houston [1st Dist.] 1981, no writ). Although the instruction given by the court in the case at bar goes further than those reported, importuning the jury to render "a true verdict based on the law and the evidence you heard *so help you God,*" we do not perceive from the record that the jury was coerced to render a guilty verdict by this language. We overrule the appellant's second ground of error.

▪ We also overrule the appellant's fourth ground of error, in which he claims that his life sentence violates the Eighth Amendment constitutional guarantee against cruel and unusual punishment. The statute under which the appellant was sentenced to life imprisonment, Tex.Penal Code sec. 12.42(d), was enacted to protect the citizens of this State against recidivist offenders. The statute was specifically upheld against similar attack in *Rummel v. Estelle*, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980), and was carefully distinguished from the South Dakota recidivist statute by the majority in *Solem v. Helm*, — U.S. —, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). In a five to four decision, the Supreme Court in that case reversed a South Dakota recidivist conviction because it concluded that the sentence (life imprisonment with no possibility of parole) was disproportionate to the crime and violated the Eighth Amendment.

▪ The *Solem* decision does not require us to undertake a penological survey of Texas and the other forty-nine states to review the proportionality of this sentence. The *Solem* majority stated that "the South Dakota commutation system is fundamentally different from the parole system that was before us in *Rummel.*" 103 S.Ct. at 3015. We therefore construe the majority opinion in *Solem v. Helm* to permit appellate proportionality review of recidivist convictions in states where the law punishes recidivists with mandatory life imprisonment without possibility of parole. In view of the Supreme Court's reaffirmation of its pronouncement in *Rummel,* it is unnecessary for us to attempt a review of recidivist convictions in this and other state jurisdictions.

The majority opinion in *Solem v. Helm* noted Mr. Helm's addiction to alcohol (103 S.Ct. 3013, n. 22). The dissent in the instant case, similarly noting that the offense for which the appellant was convicted could possibly be attributed to a physical addiction to cocaine, suggests that the judgment be reviewed in light of that factor.

We do not regard that nature of review as being the proper appellate function of this court. It is generally a matter for the legislature to establish appropriate ranges of punishment for offenses committed against the state, and it is principally the duty of the legislature, not this court, to formulate public policy. Similarly, we believe that the determination of the exact sentence to be imposed within the ranges provided by statute is a matter peculiarly within the province of the judge and jury. Thus, we conclude that our function is generally restricted to a review of the judgment to assure that the defendant received a fair and impartial trial, and that no error occurred which would warrant a reversal of the trial court's judgment.

If this court were to substitute its judgment as to the excessiveness of the sentence, for that of the trial judge and jury, our review of criminal appeals would lead to much uncertainty in the law. This, in turn, would make the law itself seem arbitrary and unpredictable, and thus undermine the accountability that individuals feel for their infractions of the law.

All penal laws attempt to instill in the individual a sense of accountability for his actions, and the recidivist statute goes one step further, requiring accountability for an individual's decision to continue breaking the law, not just for the infraction itself. *See Arbuckle v. State*, 132 Tex. Cr.R. 371, 105 S.W.2d 219, 221 (1937). The recidivist statute has been reviewed by the Supreme Court and found to be constitutional, and we find no circumstances in this case indicating a need for further determination of its constitutionality. We are satisfied from our review of the record that the sentence was lawfully imposed by the jury, and as stated before, we conclude that our judgment of the appellant's culpability should not be substituted for that of the jury. We further conclude that the legislature's enactment of the repeat offenders statute was intended to further a legitimate public policy, and that the statute is as binding on this court as it is on any citizen of the state. Therefore it is our duty to sustain the sentence imposed in accordance with the statute.

The judgment of the trial court is affirmed.

LEVY, J., dissenting.

LEVY, Justice, dissenting.

Primarily—but not solely — because the majority wrongly treats the appellant's brief complaint that the Texas recidivist statute, art. 12.42(d) of the Texas Penal Code (1974), offends the Eighth Amendment to the United States Constitution, I respectfully dissent.

The words of the Eighth Amendment— "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted" — are majestic and sweeping, not precise. They derive their meaning "... from the evolving standards of decency that characterize the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). We have had few occasions to give precise content to the Eighth Amendment, and in an enlightened democracy such as ours, this is not surprising. But this case reaffirms that the need for its protection is as acute today as it has ever been. And the extension of the "cruelty" concept by the Supreme Court in *Trop, supra*, to comprehend mental suffering as well as physical pain, portends the application of the Amendment's protection to many currently accepted penalties which, while physically unobjectionable, subject the convicted to grievous psychic strain.

Clearly, the words are not static because the basic concept underlying the Eighth Amendment is nothing less than the dignity of the human personality. While the State has the power to punish, this Amendment is the principal safeguard to assure that such power be exercised within the limits of civilized standards. *See Weems v. United States*, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910), a landmark case expounding and applying the Eighth Amendment, which also cites with approval the dissent in *O'Neil v. Vermont*, 144 U.S. 323, 339–40, 12 S.Ct. 693, 699–700, 36 L.Ed. 450, 458 (1892), wherein Mr. Justice Field asserted that "all punishments which by their

excessive length or severity are greatly disproportioned to the offenses charged" are barred.

In *Solem v. Helm*, —— U.S. ——, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), the Supreme Court held that the Eighth Amendment prohibits not only barbaric punishments, but also sentences that are disproportionate to the crime committed. This holding, as the minority therein vigorously protested, significantly modified and "cannot be rationally reconciled with" the Court's recent and prior decision in *Rummel v. Estelle*, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382, on remand 498 F.Supp. 793 (writ of habeas corpus granted) (1980), which had upheld the recidivist statute here under attack. Therein the *Solem* Court traced the development of the principle that a punishment should be proportionate to the crime from the Magna Carta, which had decreed in 1215 that His Majesty's subjects shall be free from the cruelty of excessive punishment.

An appellate court should, of course, always be aware that legislatures have broad authority in determining the mode and limits of punishment for crimes, and grant substantial deference to the discretion that trial courts possess in sentencing convicted criminals. In applying the Eighth Amendment, the appellate court accordingly decides *only* whether the sentence under review is within constitutional limits. As the Supreme Court noted in *Robinson v. California*, 370 U.S. 660, 667, 82 S.Ct. 1417, 1421, 8 L.Ed.2d 758, 763 (1962), a single day in prison may be unconstitutional in some circumstances. No penalty is *per se* "constitutional". Even one day in jail would be a cruel and unusual punishment for the "crime" of sneezing. And a life sentence for overtime parking would clearly invoke the Eighth Amendment's protection.

In *Solem v. Helm*, upon which this dissent heavily relies, the Supreme Court set out several objective factors to consider when sentences are reviewed under the Eighth Amendment, recognizing that no single criterion can identify when a sentence is unconstitutionally disproportionate. What factors come to mind, first of all, are the gravity of the offense and the harshness of the penalty. Secondly, the sentences imposed on other criminals in the same jurisdiction. If more grievous crimes are subject to the same penalty, or to less serious penalties, that is some indication that the punishment at issue may be "excessive." Thirdly, the sentences imposed for commission of the same crime in other jurisdictions.

Courts traditionally have made these judgments—just as legislatures must make them in the first instance. Comparisons can be made in light of the harm caused or threatened to the victim or society, and the culpability of the offender. For example, applying necessary social values, victimless or nonviolent crimes are less serious than crimes marked by violence or the threat of violence, which is perhaps another way of saying that crimes against individuals are more antisocial than crimes against property.

The magnitude of the crime may be pertinent—stealing a million dollars is more serious than stealing a loaf of bread. There is little dispute that a lesser-included offense should not be punished more severely than the greater offense, or that attempts are less serious than completed crimes.

As to the culpability of the offender, a court is, of course, entitled to examine the defendant's motive in committing a crime. Negligent conduct, for example, is less serious than intentional conduct or malicious acts.

This combination of *objective* factors, though by no means exhaustive, can make an analysis possible for comparing the severity of different crimes on a broad scale.[1] Applying these principles to the appellant, Simpson, it must be noted at the outset that Simpson was not charged simply with possession of cocaine—found on the front

---

1. There is also a clear distinction between sentences of imprisonment and sentences involving no deprivation of liberty. See *Argersinger v.* *Hamlin*, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972).

seat of the car in which he was a *rear* seat passenger—but also was charged with being a habitual offender. Simpson's two prior convictions were also for non-violent crimes against property; specifically, burglaries of a building. And a State is clearly justified in punishing a recidivist more severely than it punishes a first offender. His primary offense—possession of a mere 9.5 milligrams [2] of cocaine—is certainly one of the most passive felonies a person could commit. It involved neither violence nor the threat of violence to any person. Moreover, many authorities consider narcotics addiction or usage basically a psychological or medical problem, not *per se* criminal conduct. Under British law, for example, addicts are patients, not criminals. The doctor has almost complete professional autonomy in reaching decisions about the treatment of addicts. Schur, "British Narcotics Policies," 51 J.Crim.L. and Criminology 619, 621 (1961). Addicts have not disappeared in Britain, but they have decreased in number, *Id.*, at 622, and there is now relatively little "addict-crime" there.

For a thorough discussion of the concept that narcotics addiction is an illness rather than a crime, see the concurring opinion of Mr. Justice Douglas in *Robinson v. California, supra,* 82 S.Ct. 1417, 1421 to 1426. When expressing my profound agreement with the civilized concept therein developed, I am not oblivious to the vicious evils of the narcotics traffic that have occasioned the intense concern of government, both state and federal. Punitive measures are certainly justified where they reasonably relate to such transgression against the community. But this is not to say that *being an addict* should be punished as a crime, any more than psychosis can be so punished. The addict, like the psychotic, may of course be confined for treatment or for the protection of society. Each has a disease and each should be treated as a sick person. Cruel and unusual punishment results not solely from confinement, but also from branding the addict as a criminal. We have indeed progressed from the Seventeenth Century, when the violently insane went to the whipping post and into prison dungeons, "until they had regained their reason", or, as sometimes happened, were burned at the stake or hanged, and the pauper insane often roamed the countryside as wild men and from time to time were pilloried, whipped, and jailed. *See* Deutsch, "The Mentally Ill in America" (1937), p. 13; "Action for Mental Health" (1961), p. 26. Today we have in the various states different definitions of insanity, but ultimately it is treated as a disease, not a crime. The punitive approach continues, however, with respect to drug addicts. So much of the Controlled Substances Act seeks not to cure, but to penalize, to punish sick people for being sick, and I vehemently agree with Mr. Justice Douglas that "[T]his age of enlightenment cannot tolerate such barbarous action." *Robinson, supra,* at 1426.

Claiming that the flexible parole system [3] in Texas makes it unnecessary to review recidivist convictions on the basis of the objective criteria set out in *Solem v. Helm,* the majority concludes that the primary function of appellate courts is to review judgments "to assure that the defendant received a fair and impartial trial". I disagree somewhat with both assertions, the first one of which has already been discussed in this opinion. As to the second, it is illuminating to remember that debtor's prison, slavery, the pillory, prohibition of alcoholic beverages, and other such practices or institutions were applied through "fair and impartial trials" in the custom of the day. Critically important as they are, "fair and impartial trials" are still *means* to the transcendent purpose of ensuring in each case and under all circumstances the establishment of humane and reasoned jus-

**2.** 28.35 grams are equivalent to one ounce, and there are one thousand milligrams to one gram. 9.5 milligrams, therefore, weigh .0003325 ounce.

**3.** A Texas prisoner becomes eligible for parole when his calendar time served plus "good con-

duct" time equals one-third of the maximum sentence imposed or 20 years, whichever is less. Tex.Code Crim.Proc.Ann., art. 42.12 sec. 15(b) (Vernon 1979).

tice. In our system, the law itself—both statutory and case—must unswervingly respect, and be evaluated by its subordination and adherence to, the Constitution, and especially the Bill of Rights, as embodying the most basic, compelling, and revered principles upon which this nation was founded, which rights were deliberately placed *beyond* juries, officials, political vicissitudes, and elections. Our constitutional history has shown that the lofty principles contained in the Bill of Rights—including, of course, the Eighth Amendment—are safest when the courts are most sensitive to their preservation, necessarily discounting whatever ad hoc "uncertainty" or "unpredictability" may temporarily result. Not certainty, not predictability, not efficiency, but the attainment of justice is the overriding purpose of the law—and of the courts which interpret and apply it.

Criminalized possession of cocaine inevitably evokes memories of half-a-century ago, when the federal Volstead Act, 27 U.S.C. sec. 12, penalized possession of intoxicating liquor. The legal and social disasters flowing from that experiment in legislating "victimless" crimes are indeed legendary, and still disquieting. In my view, they are disturbing enough to mandate judicial review under the Eighth Amendment of appellant's sentence.

Because Simpson has received the penultimate sentence for relatively minor criminal conduct, he has been treated much more harshly than other criminals—murderers, violent assailants, rapists, etc.—who have committed more serious and violent crimes in this State. I conclude that his sentence is significantly disproportionate to his crime, and therefore offends the Eighth Amendment.

In addition, I would sustain Simpson's ground of error complaining that the evidence was insufficient to support the jury's verdict.

The arresting officers testified that the "specific and articulable" facts that justified their intrusion were that a car was parked at night in a poorly-lit stall of a car wash and was not being washed. "That's what was suspicious about it, it was just sitting there." I do not perceive this suspicion as a "particularized and objective basis for suspecting the particular person stopped of criminal activity," as required by *United States v. Cortez*, 449 U.S. 411, 417-18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, 629 (1981). In *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906 (1968), the Court held that "... [t]his demand for specificity in the information upon which police action is predicated is the central teaching of this court's Fourth Amendment jurisprudence." Specificity is not satisfied, in my judgment, by observing an unwashed car in a car wash stall. Quite the contrary, the majority opinion constitutes a dangerously close approach to

"... an abdication of judicial control over, and indeed an encouragement of, substantial interference with liberty and personal security by police officers whose judgment is necessarily colored by their primary involvement in 'the often competitive enterprise of ferreting out crime.' *Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436, 440 (1948)." *Terry v. Ohio, supra,* 88 S.Ct. at 1875.

At such times as these, the reviewing court must bear in mind that simple good faith on the part of the officer is not enough to justify intrusions upon constitutionally guaranteed rights. "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pac. Ry. Co. v. Botsford,* 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891). If subjective good faith alone were the test, the protections of the Fourth Amendment against unreasonable search and seizure would evaporate, and the people would be 'secure in their persons, houses, papers, and effects' only in the discretion of the police. *Beck v. Ohio,* 379 U.S. 89, 97, 85 S.Ct. 223, 229, 13 L.Ed.2d 142, 148 (1964). To prevent such an evaporation, this Court must require something more substantial than an inarticulate

hunch. And it may seem trite but necessary to repeat that a search is not to be validated by what it turns up. In law it is good or bad *ab initio* and does not change character from its success. Or, in the words of Mr. Justice Frankfurter, "Vindicated anticipation of what an illegal search may reveal does not validate a search otherwise illegal." *Lustig v. United States*, 338 U.S. 74, 80, 69 S.Ct. 1372, 1375, 93 L.Ed. 1819, 1824 (1949).

Upon this shaky foundation for justifying the search, the State builds an equally unstable superstructure, attempting to link the cocaine to the appellant. The bottle cap alleged to have been in the appellant's possession was found in the front seat of the car, occupied by the driver and a female passenger. There was no proof that the car belonged to the appellant, or that he had any cocaine on, in, or about his person. "Possession" being defined by the Controlled Substances Act, Sec. 1.02(23), as "actual custody, control or management," it is difficult, but perhaps not theoretically impossible, for me to understand how the appellant, sitting in the rear of the car, could be shown to have knowing "possession" of the bottle cap in the front seat of the car. This is not the required "proof beyond a reasonable doubt", as I understand the term. And the essential teaching of *Rodriguez v. State*, 635 S.W.2d 552 (Tex.Cr.App.1982), cited erroneously by the majority as its support, is that merely close proximity to the drug is *insufficient;* the State's evidence "... must affirmatively link the accused to the contraband ..." to show the requisite knowing possession. Such affirmative linkage is absent herein. As *Rodriguez, supra,* held at 554, "While the evidence may *suggest* appellant's guilt, the proof here amounts only to a mere probability or strong suspicion and is insufficient to prove beyond a reasonable doubt that appellant possessed the contraband in question."

It follows that I would have sustained the appellant's first ground of error, alleging that the trial court erred by denying his motion to suppress the evidence.

For these reasons, I dissent and would reverse with directions to enter a judgment of acquittal.